EASTERBROOK, Circuit Judge.
 

 This is a bankruptcy case. Morse Electric Co., the bankrupt, took part in the construction of a toll plaza and utility building on the Indiana Toll Road. The project was covered by a performance bond, as state law required. The bond secures payment to suppliers that “furnished material or other service in the construction of any highway”, Ind. Code § 8-13-5-9.2. The parties have treated claims against the bond as secured claims for purposes of bankruptcy law.
 

 When Morse filed its petition in bankruptcy, it was owed a substantial sum for its work on the highway and three other projects. Morse filed an adversary proceeding in the bankruptcy demanding that the money be turned over to it and naming 21 firms that might claim an interest in the money. After some preliminary proceedings that are no longer important, the money was tendered into court. Because the bonding company, if called on to pay, would be subrogated to any claims to this fund, the parties have agreed to proceed in its absence and to treat all claims covered by the construction bond as secured claims against the fund. One of the claims is before us now: Hoosier Fence Co. seeks $65,000 plus interest for five large concrete barriers sold to Morse.
 

 The bankruptcy judge concluded that the barriers, designed to separate traffic from hazards and people during a construction project, are movable and reusable. They were not incorporated in the project and so were covered by the bond, the judge concluded, only to the extent of their implicit rental value for the duration of the project. The bankruptcy judge fixed this at $40,000, giving Hoosier a secured claim for $40,000 and an unsecured claim for $25,000. On appeal by Morse, the district court concluded that because the barriers are reusable they are not covered by the bond at all. This left Hoosier with an unsecured claim for $65,000, and it appealed to us.
 

 I
 

 The jurisdictional section of Hoosier’s brief states that this court “has jurisdiction over this cause in accordance with 28 U.S.C. § 1291 (1976), in that it is an appeal from a final judgment” of a district court. Section 1291 is the wrong statute in bankruptcy cases — at least as a rule, and we need not consider whether there are exceptions. Cf.
 
 In re Memorial Estates, Inc.,
 
 797 F.2d 516 (7th Cir.1986) (on occasion 28 U.S.C. § 1292(a)(2) may supply appellate jurisdiction). The right statute here is 28 U.S.C. § 158(d), which also contains a finality requirement. At oral argument we inquired whether the disposition could be final, when the adversary proceeding in the bankruptcy court continued. Questions
 
 *264
 
 from the bench explicitly inquired about the status of Westinghouse Electric Supply Co., which had a substantial claim against the fund, and asked whether the district court had made the judgment final under Fed.R.Civ.P. 54(b). The court called for supplemental memoranda from the parties.
 

 The memoranda were filed, but neither mentions Rule 54(b) or the word “Westinghouse”. Hoosier, the appellant, does not say a thing about which claims remain to be resolved in the adversary proceeding. Morse’s memorandum catalogs some of the remaining parties, of which there are at least seven, but does not describe their claims. These submissions are unresponsive to the court’s request. We wanted to know the status of Westinghouse and any order under Rule 54(b). Neither side supplied the information that the court requested.
 

 The court needs — more, is entitled to— the scrupulous assistance of the bar in determining jurisdiction. Jurisdiction is the first question in every appeal.
 
 In re Boomgarden,
 
 780 F.2d 657, 650 (7th Cir. 1985). The appellant must investigate jurisdictional factors before appealing and explain those factors fully to the court. Jurisdictional questions are pervasive in bankruptcy cases because of the tension between the “finality” rule of § 158(d) and the fact that each bankruptcy proceeding contains many claims and problems, each of which may come to a final conclusion before the estate has been wrapped up. Most courts have treated “final” in § 158(d) more liberally than they treat the same word in § 1291. E.g.,
 
 In re Riggsby,
 
 745 F.2d 1153, 1154 (7th Cir.1984); see also
 
 In re Saco Local Development Corp.,
 
 711 F.2d 441, 444 (1st Cir.1983). But see
 
 In re Delta Services Industries,
 
 782 F.2d 1267, 1270-72 (5th Cir.1986). The task is complicated by the fact that district courts may elect to hear appeals from bankruptcy judges’ interlocutory orders, 28 U.S.C. § 158(a), while only “final” orders of district judges are appealable to the court of appeals under § 158(d). We have jurisdiction only if the bankruptcy court’s decision also was final.
 
 In re Cash Currency Exchange,
 
 762 F.2d 542, 546 (7th Cir.),
 
 cert. denied,
 
 — U.S. —, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985). There is therefore a large but ill-defined category of orders for which the appeal to the district court is the end of the line. Counsel must scrutinize the record and consider the cases to separate the appealable from the interlocutory; they may not automatically appeal, as Hoosier appears to have done, and hope that the problem will escape notice or that the judges will do all the work of separating interlocutory from final orders. Nonetheless, we must decide the case on the merits if it is within our jurisdiction. A party that fails to make the necessary jurisdictional allegations will have its claim dismissed, see
 
 Sarnoff v. American Home Products Corp.,
 
 798 F.2d 1075, 1078-79 (7th Cir.1986), but Hoosier made the appropriate allegations, and we conclude that the memoranda jointly show that we have jurisdiction.
 

 A disposition of a creditor’s claim in a bankruptcy is “final” for purposes of § 158(d) when the claim has been accepted and valued, even though the court has not yet established how much of the claim can be paid given other, unresolved claims. See
 
 In re Fox,
 
 762 F.2d 54, 56 (7th Cir. 1985). When one creditor’s position is finally determined (subject only to proration at the end of the case to reflect the amount of assets and other allowed claims), the disposition is final. An order that leaves a claimant “nothing more to do than await the outcome of third-party litigation” is final under § 158(d) even though an equivalent order would not be final under § 1291 in the absence of a judgment under Rule 54(b). Cf.
 
 In re Goldblatt Bros., Inc.,
 
 758 F.2d 1248, 1251 (7th Cir.1985). The rationale for this is that the bankruptcy case has several stages that are independent in ordinary litigation. If Creditor
 
 C
 
 had sued Debtor
 
 D
 
 outside of bankruptcy and secured a judgment certain in amount, the judgment would be appealable even though C’s ability to collect was doubtful. Collection proceedings are separate. The bankruptcy case comprises proceedings involv
 
 *265
 
 ing many
 
 C
 
 s and containing its own collection and distribution processes. A disposition of a claim that would be final as a stand-alone suit outside of bankruptcy is also final under § 158(d) in bankruptcy. Such a claim is far enough along to be intelligently resolved, without duplicative appellate review of the same creditor’s situation. Only the collective decision (what percentage of each claim of a given class will be paid) remains for final review. Deferring appellate review would complicate this computation without making it any easier to resolve each individual claim.
 

 If Hoosier’s claim were a suit outside of bankruptcy, the district court’s disposition would be “final”. The district court held Hoosier entitled to $65,000 but determined that none of Hoosier’s claim is secured. All that remains is the decision what percentage of Morse’s unsecured claims will be paid. That will be influenced by whether the bankruptcy court allows other claims to Morse’s assets, but these third-party disputes do not involve Hoosier or pose a risk of a second appellate go-round on additional issues peculiar to it. If the district judge had affirmed the bankruptcy judge, however, things might have been otherwise. (“Might” because the parties have not furnished enough information to enable us to tell.) There are other claims against the fund, and these competing claims may have led to a reassessment of how much of Morse’s claim would be deemed secured. The total of allowed “secured” claims cannot exceed the amount of the fund, posing a risk that Hoosier’s claim would be back for further proceedings. On the other hand, we have held that an order fixing the amount of a secured claim may be appealed even though the priority of the claim is not yet settled.
 
 In re J. Catton Farms, Inc.,
 
 779 F.2d 1242, 1250 (7th Cir.1985). Perhaps this principle could support an appeal. We need not say. Because the district court turned Hoosier into an unsecured creditor, the remaining goings-on in the adversary proceeding do not prevent the appeal.
 

 Although, as we have emphasized, the disposition of one but not all claims in a larger case is not final under § 1291 in the absence of separate judgment under Rule 54(b), such separate judgments are not necessary in bankruptcy cases. Rule 54(b) is a device to make a judgment “final” and allow immediate execution — or allow a prevailing party to go his way secure that the case against him is over. The filing of the Rule 54(b) judgment starts a mechanical process: appeal now or never.
 
 Exchange National Bank v. Daniels,
 
 763 F.2d 286 (7th Cir.1985). The definition of “finality” in a bankruptcy proceeding, however, does not depend on the entry of a separate judgment. Indeed there are not conventional “judgments” in many of the claims that arise in bankruptcy; there are only dispositions on the way to the approval of the final plan. So the fact that Hoosier joined this litigation as one of 21 parties in a separate adversary proceeding is unimportant. Finality of the order comes from the fact that it resolves
 
 all
 
 of Hoosier’s claims against the estate. The fact that Hoosier was in one pool of creditors rather than in the grand pool that is the whole case is a detail.
 

 An adversary proceeding may produce a traditional judgment (for example, an order adjudicating a claim that the debtor committed a tort) but need not. The more an adversary proceeding looks like an independent lawsuit, attached to a bankruptcy case only because someone happens to be bankrupt, the more we will insist on adherence to the norms of finality under § 1291 and Rule 54(b). But when, as here, the adversary proceeding is a core proceeding to value a creditor’s undisputed claim, see 28 U.S.C. § 157(b)(2), a resolution of one creditor’s full position is “final” under § 158(d) without the need for a formal entry of a separate judgment under Rule 54(b). The district court’s order is therefore appeal-able.
 

 II
 

 The huge concrete barriers can be reused unless destroyed by the impact of a truck.
 
 *266
 
 The district court reasoned that because the barriers are reusable and are not physically incorporated into the highway or toll plaza, they are not covered by the statute and bond. The court thought that only goods and services used “solely” in a construction project are covered by the bond. This makes the bond a substitute for a mechanic’s or materialman’s lien; the state gets its project without liens, and the former lien holder receives a claim against a solvent bonding company. The use of the barriers during the course of construction would not have given rise to a lien against the toll plaza. They are not incorporated into the building. The seller of the barriers could have taken a security interest in the barriers themselves under the Uniform Commercial Code. As the district court characterized the transactions, the barriers were no different from trucks Morse used to move materials or from the desks in Morse’s office: none was incorporated in a road or building, so none was covered by the bond. The district judge also thought that there was “no evidence” to show that some portion of the price of the barricades was incorporated into the toll plaza project. He held the entire $65,000 claim to be unsecured.
 

 The bankruptcy judge, on the other hand, characterized the case as one in which Morse devoted the barriers to the toll plaza project exclusively for a period of time. The desk and the trucks served many projects simultaneously; the barriers served but one, and their cost therefore could be charged against that project’s bond. As the bankruptcy judge saw things, the function of the bond was to assure suppliers of payment and make it easier for the state to employ a full range of subcontractors — including subcontractors that might be too shaky to attract credit — in its construction projects. The statutory requirement, according to the bankruptcy judge, is not physical incorporation but exclusive use, and then only for a period of time. The barriers were delivered to the toll plaza project for use on the site; they were used exclusively there until Morse went bankrupt. This left for the bankruptcy judge the problem of valuing the use. He solved this by observing that Hoosier had sold the five barricades to Morse for $13,000 apiece and had offered to repurchase the barriers from Morse for $5,000 each if they were undamaged at the end of the project. This led the bankruptcy judge to conclude that $8,000 of each barrier, or $40,000 in all, “went into” the toll plaza project and could be recovered from the bond. The remaining $25,000 became an unsecured claim.
 

 Hoosier offers still a third position. It insists that the barriers were delivered to a construction site for use in the process of construction. According to Hoosier, that alone shows that the full purchase price of each barrier is covered by the bond.
 

 The bankruptcy judge had it right in principle. The statute in question, Ind. Code § 8-18-5-9.2, does not limit the coverage of the bond to materials physically incorporated into the project. It protects those who have “performed any labor or furnished material or other service
 
 in
 
 the construction of any highway or bridge in the state highway system” (emphasis added). The courts of Indiana have treated this language as covering materials dedicated exclusively to some project for a period of time or used up in the project, even if not incorporated into a building, road, or bridge. For example,
 
 George T. Miller Constr. Co. v. Standard Oil Co.,
 
 205 Ind. 509, 185 N.E. 639 (1933), held that the cost of gasoline used by trucks to move materials within a construction site is covered, although the gasoline plainly was not incorporated into any building and could not have supported a lien against the building. Closer to the point,
 
 Middle West Roads Co. v. Gradmont Haulage Co.,
 
 103 Ind.App. 297, 7 N.E.2d 528 (1937) (en banc), held that the rental value of trucks used in construction is covered by the bond. The contractor hired trucks and drivers by the hour; so far as the opinion shows the trucks had value after the construction had been completed; nonetheless, the court held the hire within the scope of the bond.
 

 
 *267
 
 What happened here is fundamentally the same as in
 
 Middle West,
 
 with the difference that Morse bought the barriers (and an option to resell) rather than renting them. The barriers, like the trucks, were devoted exclusively to the construction project for a period of time and in all likelihood had some value at the end of the project. Counsel for Morse conceded at oral argument that if Morse had purchased trucks and used them exclusively in the toll plaza project for a year, the seller of the trucks would be protected by the bond to the extent of the first year’s depreciation of the trucks — the amount of their value that was consumed by the project. The same principle logically applies to the barriers.
 

 Morse replies that
 
 Southern Surety Co. v. National Lumber Co.,
 
 73 Ind.App. 592, 122 N.E. 686 (1st Div.1919), cuts the other way.
 
 Southern Surety
 
 held that the value of timber used to support earthworks was not covered by a construction bond because the timber was not incorporated into the project. That case, however, did not consider the possibility that the bond covered the depreciation of the timber during use; the court appeared to assume that the timber was as valuable after the project as before. It was also decided under a bond with a wording different from Ind. Code § 8-13-5-9.2, and it predated
 
 Miller
 
 and
 
 Middle West.
 
 If
 
 Southern Surety
 
 governs today on its own facts, which we doubt, it does not govern on ours.
 

 Both parties argue that the record is missing some fact vital to the other party’s case. Hoosier contends that the record does not show what has become of the barriers. They were removed from the toll plaza, but in what condition? If they were demolished, then they were used up in the project and logically are covered in full by the bond.
 
 *
 
 Morse replies that the record does not show that the barriers were affected in the least by their tenure at the toll plaza and insists that because they may be used elsewhere, nothing was consumed and nothing is covered by the bond. Each of these points is logical. Ordinarily a judge may assume that a heavy chunk of concrete, like an automobile, will survive longer than a year, but these barriers were targets for speeding trucks, and their condition is unknown. The bankruptcy judge should have ascertained their condition before deciding the case.
 

 The bankruptcy judge also should have invited the parties to submit evidence on the value of the barriers at the end of their stay at the toll plaza. The parties treated the case in the bankruptcy court as an all-or-nothing matter; neither side offered evidence of the current value of the barriers because neither thought it mattered. The bankruptcy judge introduced the idea that the bond covers the amount by which the barriers depreciated while in use at the project. The judge seized on Hoosier’s offer to repurchase barriers in good condition for $5,000, and this suggests that the depreciation was $8,000. We therefore do not agree with the district judge that the record contains “no evidence” that the barriers had value after the toll plaza project. The $5,000 bid by Hoosier and the physical characteristics of the barriers are “evidence”. See
 
 Kendall Lumber & Coal Co. v. Roman,
 
 120 Ind.App. 368, 377, 91 N.E.2d 187, 191 (1950) (en banc). Still, the parties did not have an opportunity to adduce other evidence. There may be a market in such items, and if other firms stand ready to buy at, say, $10,000 — or if such barriers usually last longer than two years — then the depreciation is less than $8,000 apiece and the amount covered by the bond correspondingly less. When a judge concludes that neither side has advanced the correct analysis, and when the judge’s approach implies a need for additional evidence, he ordinarily should invite
 
 *268
 
 the parties to supply the evidence before entering a judgment.
 

 So although we believe that the bankruptcy judge took the right approach to the meaning of the statute, and that some of the value of the barriers is covered by the bond, the parties should be asked for evidence showing how much. The judgment of the district court is reversed, and the case is remanded with instructions to remand to the bankruptcy court for further proceedings consistent with this opinion.
 

 *
 

 Unless the bond covers only the portion expected to be consumed, rather than the portion actually consumed. But neither party raises this possibility, and we do not pursue options that were not offered to the district judge. We therefore assume, without saying that this is the inevitable reading of the statute, that the coverage of the bond depends on how things turn out rather than what was expected to happen.