POSNER, Circuit Judge.
This litigation over liens in a patent license raises questions of Illinois lien and fraudulent-conveyance law — some of which, however, we are able to duck — plus jurisdictional issues, which we can never duck.
Andrew Pincon owns a patent (actually two patents, but we shall simplify the facts to make the opinion easier to follow) on the “photozone” process for purifying water. In 1977 he formed Ionization International, Inc. to exploit the process. He was its principal officer and shareholder. He gave the corporation an exclusive license to practice the patent in North America in exchange for the corporation’s promise to pay him royalties on products using the patented process. In 1980 he sold 20 percent of the stock of Ionization to Eric King for $300,000. The purchase entitled King to a seat on Ionization’s board of directors.
Shortly afterward, King and Pincon had a falling out, and King sued Pincon and Ionization. The suit was settled in 1981 by an agreement under which Ionization repurchased King’s stock, giving King two promissory notes for a total of $320,000. The notes were secured by the patent license, but King failed to file the security agreement with the Illinois Secretary of State, which is the usual method of perfecting a security interest in Illinois. The settlement agreement entitled King to retain his seat on the board of directors but he resigned in favor of his brother-in-law, *1183 John Kitanoja, who agreed to be King’s representative on the board.
By the middle of 1983 Ionization was in deep financial trouble. It had defaulted on one of the promissory notes to King and was in danger of being forced into bankruptcy; it may already have been insolvent. It owed money to a number of other people as well, including Pincon — to whom it owed almost $160,000 in back wages and royalties and almost $106,000 for cash loans that he had made to the company — and Pincon’s wife, Andromeda, who also worked for the company and who was owed more than $60,000 in back wages. At a meeting of the board of directors on September 27, 1983, Pincon proposed that the corporation issue fresh promissory notes to all its creditors (including the Pincons), secured by Ionization’s assets — the principal asset being the patent license. The board, controlled by Pincon, approved the proposal, the action being reflected in the minutes of the board meeting. The notes were issued several weeks later. The total face amount of the notes was $428,000, of which $327,-000 was for the Pincons. (We have rounded off all dollar figures to the nearest thousand.) John Kitanoja received a note for $7,000. At its meeting on January 26, 1984, the board unanimously approved the minutes of the previous meeting; Kitanoja was one of the directors who voted to approve them. It was also at this meeting that Kitanoja received his note, which he deposited in his safe-deposit box. The Pin-cons and the other recipients of the notes filed them promptly with the Secretary of State in an effort to obtain perfected security interests in the patent license and other assets of Ionization.
King brought this diversity suit in February 1984 to collect the unpaid balance of one of his notes, the other having been paid. He named as defendants Ionization and the Pincons, who had guaranteed the note. The district court entered a default judgment against the defendants in April 1984, and proceedings to collect the judgment ensued before a federal magistrate. See Fed.R.Civ.P. 69. In June, King obtained a writ of execution — thereby at last perfecting his security interest. See Kaiser-Ducett Corp. v. Chicago-Joliet Livestock Marketing Center, Inc., 86 Ill.App.3d 216, 219, 41 Ill.Dec. 651, 653, 407 N.E.2d 1149, 1151 (1980); Asher v. United States, 436 F.Supp. 22, 25 (N.D.Ill.1976), aff’d, 570 F.2d 682 (7th Cir.1978); see generally General Telephone Co. v. Robinson, 545 F.Supp. 788, 792-97 (C.D.Ill.1982). In July the magistrate ordered the defendants to turn over certain assets to King in satisfaction of the judgment. The order was later vacated, reinstated, then repeatedly stayed. The magistrate entered another order restraining the defendants from disposing of the assets, and later she ordered the defendants to deposit some of those assets— including the patent license — with the United States Marshal to satisfy King’s judgment.
By now it was 1985 and various creditors of Ionization, notably Water Management, Inc., intervened in the post-judgment proceedings. Water Management is another corporation formed by Andrew Pincon. Although he does not own any stock in it, he has served as its president, and one of its shareholders is a foreign holding company owned in part by a trust for the benefit of Pincon’s children by a previous marriage; the record does not show how large the trust’s indirect stake in Water Management is. In January 1985 Water Management had bought from Andrew and Andromeda Pincon the notes that Ionization had issued to them in 1983. Water Management had also purchased two judgments against Ionization, one in favor of the First National Bank & Trust Co. of Evanston and the other in favor of McWil-liams, Mann & Zimmer.
Also intervening in King’s suit against Ionization and the Pincons was Photozone, S.A., another corporation that Pincon had formed and that is owned in part by the foreign holding company that is a part owner of Water Management. Photozone had loaned Ionization some $20,000 and had been among the creditors to receive secured notes.
The magistrate ruled that King’s judgment had priority over all of Water Management’s and Photozone’s claims ex *1184 cept the claim based on the First National judgment, and over all other creditors’ claims as well. She entered a final judgment for King under Fed.R.Civ.P. 54(b), retaining jurisdiction to determine whether he had collected part or for that matter all of the default judgment by selling goods covered by the Pincon patent license without paying royalties to Ionization. Water Management and Photozone have appealed, and King has cross-appealed in the hope of knocking out Water Management’s claim based on the First National judgment.
Before we can reach the merits we must satisfy ourselves that we have jurisdiction of these appeals. If this were a bankruptcy proceeding, an order fixing priorities among creditors would be deemed sufficiently final to be appealable even under the new bankruptcy appeals statute (28 U.S.C. § 158(d)), which makes only final orders appealable to the courts of appeals. See In re Wagner, 808 F.2d 542, 544-45 (7th Cir.1986). This would be so although further proceedings might (as here) be necessary to determine how much money each creditor would actually realize from the liquidation of the bankrupt estate. See In re Morse Elec. Co., 805 F.2d 262, 264-65 (7th Cir.1986); In re J. Catton Farms, Inc., 779 F.2d 1242, 1250 (7th Cir.1985); In re Fox, 762 F.2d 54, 56 (7th Cir.1985); In re Saco Local Development Corp., 711 F.2d 441, 446-48 (1st Cir.1983). However, not only is this not a bankruptcy proceeding, it is a post-judgment proceeding. And while the principles that govern the appeal of pre-judgment orders as well as of final judgments are reasonably well settled, this is not true of post-judgment orders. Obviously the last order can be appealed, but beyond that the picture dims. See 15 Wright, Miller & Cooper, Federal Practice and Procedure § 3916 (1976). The analogy to bankruptcy is relevant, however, since decisions like Wager and Morse, in distinguishing between the establishment of the creditor’s claim and the determination of how much money he will actually receive on the claim given the existence of competing claims, rely on the distinction between (1) an ordinary civil judgment and (2) post-judgment proceedings to collect on it. The finality of (1) is not compromised by the uncertain outcome of (2), even though a case might become moot if appeals were postponed to the very end of the collection proceedings, because the defendant might turn out to be judgment-proof. See 808 F.2d at 545; 805 F.2d at 264. The possibility of mootness is not decisive against allowing an immediate appeal, because there is value in having the merits of a suit finally resolved before incurring the expense and travail — often irrevocable and sometimes embittering (as readers of Pickwick Papers will recall) — of collection proceedings, and because there is little danger that should those proceedings generate their own appeal it will raise issues overlapping the appeal from the judgment on the merits and thus require duplicative effort by the court of appeals.
Treating the post-judgment proceeding as a separate lawsuit akin to a bankruptcy proceeding — and the functional resemblance is close, since the purpose of the post-judgment proceeding is to adjust rights among competing creditors — we must decide whether the order fixing priorities is enough like a conventional final judgment to be appealable even though proceedings to collect on the order are in process. See generally Ex Parte Farmers’ Loan & Trust Co., 129 U.S. 206, 9 S.Ct. 265, 32 L.Ed. 656 (1889); Motorola, Inc. v. Computer Displays Int’l, Inc., 739 F.2d 1149, 1154 (7th Cir.1984); Ohntrup v. Firearms Center, Inc., 802 F.2d 676, 678 (3d Cir.1986) (per curiam); United States v. Washington, 761 F.2d 1404, 1406-07 (9th Cir.1985). We think it is, though this conclusion owes nothing to Rule 54(b), which by its terms is applicable only where final judgment is entered on fewer than all claims or in favor of (or against) fewer than all parties; this is not such a case. It is however a case where the post-judgment proceedings contain within themselves both a judgment phase and a collection phase. The judgment phase is the fixing of priorities, which shows that King has first claim on Ionization’s assets except for the modest amount ($24,000 plus interest) owed Water Management on the First National *1185 judgment. That phase ended with the magistrate’s order from which the parties have appealed. King’s effort to execute this judgment, where he is being met by the contention that he has already collected it by the exercise of self-help, is the collection phase and is separable for purposes of appeal.
A second question about finality is whether the judgment entered by the magistrate in the post-judgment proceedings was a final judgment directly appealable to this court or a mere recommendation to the district judge. The judge had ordered the magistrate “to conduct hearings, supervise and enter all orders on post judgment proceedings” in this case, pursuant to 28 U.S.C. § 636(b)(1)(A). But that section merely authorizes the judge to “designate a magistrate to hear and determine any pretrial matter pending before the court.... A judge of the [district] court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate’s order is clearly erroneous or contrary to law.” No provision expressly authorizes the judge to assign a magistrate to post-judgment proceedings, although we can think of no good reason not to allow such assignments and the statute does have a catch-all section: “A magistrate may be assigned such additional duties as are not inconsistent with the Constitution and laws of the United States.” 28 U.S.C. § 636(b)(3); cf. United States v. Curry, 767 F.2d 328, 330 (7th Cir.1985). However, the wording of (b)(1) appears to contemplate appeal to the district judge in the first instance, rather than to the court of appeals, from a magistrate’s order issued under that subsection; and so the courts have held with respect to (b) generally, see, e.g., Glover v. Alabama Bd. of Corrections, 660 F.2d 120, 121-22 (5th Cir.1981).
The only part of the statute that expressly authorizes the magistrate to enter a final judgment appealable directly to the court of appeals is 28 U.S.C. § 636(c); but as it is applicable to “any or all proceedings in a jury or nonjury civil matter,” 28 U.S.C. § 636(c)(1), it certainly is applicable to post-judgment proceedings in a civil case. However, the magistrate has jurisdiction under subsection (c) only when (so far as pertinent to this case) he (1) is “specially designated to exercise such jurisdiction by the district court” and (2) is acting “upon the consent of the parties.” Id. The parties did not execute a consent in writing to the magistrate’s exercise of jurisdiction under subsection (c) until several weeks after she entered the order that has been appealed to us, when they submitted a joint stipulation stating that the proceedings before the magistrate and the entry of the order had been with their consent. But this is adequate evidence of consent, in the circumstances. The statute does not require a specific form or time of consent or even that it be in writing (unless the jurisdiction is to be exercised by a part-time magistrate); and while many courts (including our own) refuse to infer consent from the parties’ behavior, see, e.g., Adams v. Heckler, 794 F.2d 303, 306-07 (7th Cir.1986), and some even have insisted (without basis in the statute) on “a clear statement by the parties,” e.g., Alaniz v. California Processors, Inc., 690 F.2d 717, 720 (9th Cir.1982) (per curiam), the joint stipulation is a clear statement by the parties. Not only is it an unequivocal representation that the magistrate was acting with the parties’ consent, but neither a party nor anyone else has ever (even in this court) challenged the representation. Cf. Lovelace v. Dall, 820 F.2d 223, 225-26 (7th Cir.1987). So there is no reason to doubt its truthfulness. Still, it would have been better if the parties had signed the consent form designed for this purpose: Form 34 in the Appendix of Forms to the Federal Rules of Civil Procedure.
There may seem to be a question whether the magistrate was “specially designated,” given that the district judge’s order referring the case to the magistrate, which we quoted earlier, referred only to subsection (b)(1). As we read section 636(c)(1), however, the words “specially designated” refer to the order designating a given magistrate to exercise jurisdiction under subsection (c) rather than to the order referring the particular case to the *1186 magistrate. Cf. 28 U.S.C. §§ 636(c)(2)-(c)(4); N.D.Ill.Rules 1.72(A)-(E), 2.41(A)-(B). At all events, whether considered the designation or the reference order or both, the judge’s order, while unclear, is not fatally defective. The order authorized the magistrate to “enter all orders,” and the magistrate and the parties have throughout treated this as an authorization to conduct proceedings under subsection (c). As the intention behind the order of reference is clear, we shall overlook the citation error. The deficiencies in the orders involved in Parks by Parks v. Collins, 761 F.2d 1101, 1106 (5th Cir.1985), and Trufant v. Autocon, 729 F.2d 308, 309 (5th Cir.1984) (per curiam), were graver, while the wording of the order in this case, together with the joint stipulation, eliminates the danger noted in Hall v. Sharpe, 812 F.2d 644, 647 (11th Cir.1987), that a reference under subsection (b), which does not require the parties’ consent, would, if treated as an authorization to the magistrate to exercise jurisdiction under subsection (c), violate the statutory (perhaps constitutional) requirement that the exercise of that jurisdiction be with the parties’ consent. The reference here was in fact if not in form a reference under section 636(c) and the magistrate exercised jurisdiction over the matter with the parties’ full consent.
The principal issue on the merits is whether King’s security interest in Ionization’s patent license has priority over the Pincon notes, bought by Water Management in 1985 and secured by the same asset. On the view we take, analysis should focus on whether the conveyance of a security interest to the Pincons back in 1983 was a fraud against King and other creditors of Ionization. See Ill.Rev.Stat. ch. 59, II4. If so, they (and Water Management, as we shall see) cannot prevail over King’s security interest, belatedly perfected though it was.
Had the notes not been supported by adequate consideration their issuance would have been a fraudulent conveyance per se, but King concedes there was adequate consideration — the Pincons really were owed all that money by Ionization for past wages, loans, and royalties. However, a transfer by a debtor to one creditor, even though for consideration, is still a fraud against other creditors if there is intent to defraud. See, e.g., Reagan v. Baird, 140 Ill.App.3d 58, 65, 94 Ill.Dec. 151, 157, 487 N.E.2d 1028, 1034 (1985). Such an intent will be found if the circumstances indicate that the main or only purpose of the transfer was to prevent a lawful creditor from collecting a debt. See, e.g., Alan Drey Co. v. Generation, Inc., 22 Ill.App.3d 611, 618-19, 317 N.E.2d 673, 679 (1974). That is a factual question, see 9 Wright & Miller, Federal Practice and Procedure § 2589, at pp. 758-59 (1971), and the district court’s answer was not clearly erroneous. Ionization, largely owned and effectively controlled by the Pincons, owed King almost $300,000 and did not have the funds to pay him. They had given him a security interest in Ionization’s principal asset, the patent license; and if and when King got around to perfecting his lien in the license, Ionization would be unable to pay the Pin-cons the more than $300,000 that it owed them. The Pincons’ only hope was to get a superior lien in the license. To this end they had Ionization issue them notes backed up by a security interest in the license and then they rushed out to file their security interest so that it would be a perfected lien.
Before they did this, the Pincons were only unsecured creditors, and King was a secured creditor. The issuance of the notes backed by a security interest and the filing of that interest were designed to put the Pincons ahead of King. Although the Pincons knew about King's unperfected security interest, this knowledge would not prevent them from getting a lien superior to his by winning the race to file. See Ill.Rev.Stat. ch. 26, ¶ 9-312; UCC § 9-312, official comment 5, example 2; 9 Anderson on the Uniform Commercial Code § 9-312:15 (1985). And although the Pincons had guaranteed King’s notes, their notes have ended up in the hands of Water Management, and the Pincons may not have enough assets to make good on the guaranty.
*1187 Pincon’s knowledge of King’s security interest, the guaranty of the debt to King, and the fact that Ionization was largely owned (and was controlled) by Pin-con and had defaulted on its debt to King, warranted the district court in finding that Pincon had acted with fraudulent intent in causing Ionization to convey to him and his wife secured interests in the assets pledged to King. This is not merely a case of a debtor who, being unable to pay off more than one of his bona fide creditors, gives favorable treatment to one rather than paying all pro rata. That is allowed; but in Vinylast Corp. v. Gordon, 10 Ill.App.3d 1043, 1050, 295 N.E.2d 523, 528 (1973), an illustrative decision applying that principle, the favored creditor did not, as here, own or control the debtor, and though he came close to controlling it there are other differences between that case and this one. The controlling principle in this case is that “one must be just before he is generous.” Till v. Till, 87 Ill.App.2d 358, 361, 231 N.E.2d 641, 643 (1967). Generosity to self (or to one’s children, see Harris v. Aimco, Inc., 66 Ill.App.3d 60, 22 Ill.Dec. 823, 383 N.E.2d 631 (1978)) does not have a heavy weight in the scales of justice. In effect, money owned by Ionization (= the Pin-cons) was shifted from one of the debtor’s pockets to another in an effort to defeat a creditor’s valid claim. The shift was a fraudulent conveyance under Illinois law.
The Pincons and Water Management argue that King slept on his rights. The utter confusion of Illinois lien law, well discussed in the General Telephone opinion, cited earlier, makes such lethargy less blameworthy than it might otherwise be. In any event there is no defense of negligence — which laches, the principle invoked by the Pincons, resembles, see Piper Aircraft Corp. v. Wag-Aero, Inc., 741 F.2d 925, 937 (7th Cir.1984) (concurring opinion) —to a charge of fraud. See, e.g., Teamsters Local 282 Pension Trust Fund v. Angelos, 762 F.2d 522, 528-29 (7th Cir.1985); Cenco Inc. v. Seidman & Seidman, 686 F.2d 449, 454 (7th Cir.1982).
They also argue that King ratified the fraudulent conveyance by the action of his representative, Kitanoja, in accepting one of the notes and in voting to approve the minutes recording the issuance of the notes to the Pincons. However, Kitanoja testified, plausibly enough, that he had had no intention of ratifying the transaction but had been confused by the whole business; and neither the Pincons nor Water Management have shown they were prejudiced by the alleged ratification.
The issuance by Ionization of notes to Photozone should be analyzed similarly. Photozone may not be quite an alter ego of Andrew Pincon but it is close enough to one that the magistrate was justified in deeming the issuance of the secured notes to Photozone, like the issuance of the notes to the Pincons, a fraudulent conveyance.
The Pincons transferred their notes to Water Management — it is Water Management rather than the Pincons that is seeking to collect them — and we must see whether this makes a difference. Water Management was formed and led by Andrew Pincon, is beneficially owned (to what extent is unknown) by his children, knew the provenance of the notes and therefore was not a bona fide purchaser, and consequently acquired no better title to the notes, relative to King, than the Pin-cons had had. Whatever Water Management paid for the notes was for the chance — no better than a gamble — that the notes could be collected, notwithstanding King’s superior lien. And it is unclear whether Water Management paid anything. Although it gave the Pincons cash (25 cents on the dollar) for the notes, this may just have been a case of the Pincons’ taking money out of one pocket and putting it into another. Water Management has never tried to enlighten the district court or us about the web of ownership interests in Water Management (or Photozone) that we suspect add up to ownership by Pincon and members of his family.
The remaining issues concern the McWilliams and First National notes. McWilliams had a judgment against Ionization and began a citation proceeding to collect it. Such a proceeding involves ques *1188 tioning the judgment debtor and examining his financial records in an effort to discover whether he has additional assets against which the judgment can be levied; if so, the court has broad powers to assure that the assets are handed over to the creditor. A citation proceeding is apparently the only way to levy judgment in Illinois against a judgment debtor’s intangible assets, such as a patent license. See Asher v. United States, supra, 436 F.Supp. at 25.
If collection is not accomplished within six months, the citation proceeding terminates unless it has been extended. See Ill.Rev.Stat. ch. 110A, 11277(f). In this case, six months passed, and the proceeding (it seemed) lapsed. Later King obtained his judgment against Ionization. Later still, Water Management — to which McWilliams had sold its judgment — obtained an extension of the citation proceeding. If the proceeding really lapsed, however, there was nothing to extend and the order was ineffective. But if, as Water Management argues, the extension was effective nunc pro tunc, then Water Management has a lien prior to King’s.
The order did not purport to have retroactive effect, and may not have been intended to. The extension may implicitly have been conditioned on the proceeding’s not having lapsed, a question the court may not have wanted to decide merely by granting the extension. The court may not even have known that the proceeding might have lapsed. In any event, as the magistrate correctly ruled, an order cannot be given retroactive effect when the effect is to destroy a subsequent lien. The office of a nunc pro tunc (“now for then”) order is to clean up the records by showing what was previously done with effect from the time done; it is not to alter substantive rights. See, e.g., Spears v. Spears, 52 Ill.App.3d 695, 697-98, 10 Ill.Dec. 395, 398, 367 N.E.2d 1004, 1007 (1977); Kooyenga v. Hertz Equipment Rentals, Inc., 79 Ill.App.3d 1051, 1055-56, 35 Ill.Dec. 382, 385-86, 399 N.E.2d 216, 219-20 (1979); Rauscher v. Albert, 138 Ill.App.3d 799, 804-05, 93 Ill.Dec. 152, 156, 485 N.E.2d 1362, 1366 (1985).
The question therefore is whether McWilliams’ lien lapsed when the six months were up. We think it did lapse. The reason for the six-month limitation is to force judgment creditors to move promptly to collect their judgments, so that property does not remain encumbered by liens indefinitely, making it hard to sell; the rights of third parties might be impaired. See Celano v. Frederick, 54 Ill.App.2d 393, 403, 203 N.E.2d 774, 780 (1964); National Bank of Albany Park v. Newberg, 7 Ill.App.3d 859, 864-65, 289 N.E.2d 197, 201 (1972). This reason is undermined if the lien created by the judgment lasts the full period of the statute of limitations for suits on a judgment, even if the judgment creditor has quit trying to collect it.
The last issue involves the First National judgment, which the magistrate held created a lien prior to that of King’s judgment. We agree with her. The only argument to the contrary is that the promissory note that First National obtained from Ionization omitted a description of the property secured by the note. The security agreement itself, however, clearly describes the property as including Ionization’s patent license. The omission from the promissory note misled no one; it was immaterial.
The judgment is affirmed in its entirety.