POSNER, Circuit Judge.
 

 The current financial crisis in the mid-western farm states is glimpsed from afar in this bankruptcy case. J. Catton Farms, Inc., a very large farming operation undergoing reorganization in bankruptcy, appeals from a judgment of the district court affirming an order by the bankruptcy judge directing Catton to pay more than $300,000 to First National Bank of Chicago. The ground of the order is that the bank had a secured interest in the proceeds of a contract that Catton had made with the U.S. Department of Agriculture not to grow corn (or grain sorghum, but we shall omit this detail). For background see Kunkel,
 
 Farmers’ Relief Under the Bankruptcy Code: Preserving the Farmers’ Property,
 
 29 S.Dak.L.Rev. 303, 330-32 (1984).
 

 In March 1982 the bank had loaned Cat-ton more than $6 million secured by Cat-ton’s “receivables, accounts, inventory, equipment and fixtures and the proceeds and products thereof.” The loan agreement defines “receivables” to include “all accounts, contract rights including, without limitation, all rights under installment sales contracts and lease rights with respect to rented lands, instruments, documents, chattel paper and general intangibles (including, without limitation, the accounts) in which the debtor has or hereafter acquires any right.” The term “inventory” is defined to include “crops, whether harvested or growing, [and] grain.” To perfect its security interest the bank filed the loan agreement in the pertinent county or state recording offices in the states where Cat-ton’s farms were located. See UCC § 9-401.
 

 A year later, in March 1983, Catton signed a “PIK” contract with the Department of Agriculture. This is a contract whereby the farmer, in exchange for not planting specified crops, is entitled to receive payment in kind, i.e., in the crops he has agreed not to plant, after the growing season. See 7 U.S.C. §§ 1348, 1444(c), 1445b-l(e); 16 U.S.C. §§ 590p(c)(l), (d)(1), (g)(1), (h)(1); 7 C.F.R. Part 770 (1984). (He is also required to plant a cover crop to prevent soil erosion.) The purpose is to reduce the supply of the crops and thereby drive up their prices. The payment in kind feature, which dates back to the early 1960s, is designed to work off the government’s large surplus holdings of these crops (stored at great expense) under other programs for keeping up farm prices, programs in which the government buys the crop instead of paying the farmer not to grow it. See H.R.Rep.No. 29, 87th Cong., 1st Sess. (1961).
 

 On April 30, 1983, shortly after signing the “PIK” contract, Catton filed for bankruptcy under Chapter 11 of the Bankruptcy code, which meant that it continued in business. In June, having duly planted the cover crop and refrained from planting corn, but not yet being entitled to delivery of the proceeds in kind under its contract with the Agriculture Department — for de
 
 *1245
 
 livery was not due till October, when the crops would have been harvested if they had been planted — Catton assigned its right to the proceeds in kind to Cargill, a large grain elevator company, receiving in exchange either $200,000 or $246,000 (the record is unclear which) in cash. When delivery of the proceeds in kind (i.e., the corn) became due, it was made to Cargill. The corn is estimated to have been worth $334,666 at the time of delivery, and that is the amount in the bankruptcy judge’s order.
 

 There seems very little doubt that the loan agreement was intended to secure the type of contractual right that Catton obtained through its deal with the Agriculture Department. The loan was very large and the bank wanted as much security as it could get. It took a security interest not only in Catton’s crops, even while they were still growing, but also, lest Catton deal away-those crops, in Catton’s contracts (which are “receivables” as defined in the contract) and the proceeds thereof. So if Catton had agreed in March 1983 to sell its 1983 corn crop for $334,666, with delivery and payment due in October 1983, the payment when made would have been the proceeds of a contract and hence additional security for the loan. It would make no difference whether the contract called for payment in cash or contemplated a barter of crops for crops; indeed, the latter would be an even clearer case of substituted collateral. And even if the loan agreement had made no reference to contract rights or proceeds, the taking of a secured interest in the crops would automatically have given the bank a security interest in the proceeds of a sale of the crops. See UCC § 9-203(3).
 

 The wrinkle in this ease is that the contract that Catton signed with the grain elevator was not a contract to sell a 1983 crop but a contract to sell a 1983 non-crop. Because it is national policy to keep farm prices above the competitive level, an agreement not to produce is a marketable asset and is the asset Catton sold. Although the loan agreement made no specific reference to this asset, the agreement’s comprehensive reference to the borrower’s contracts would seem intended to include it. In any event, Catton’s argument against recognition of the bank’s security interest is not based on the parties’ intent in signing the loan agreement; it is based on agriculture law and bankruptcy law.
 

 Catton points out that the regulations under the “PIK” program provide that assignments “will be recognized by the Department [of Agriculture] only if such assignment is made on” a specified form “and filed with the county committee.” 7 C.F.R. § 770.6(e) (1984). And “except as provided in paragraph (e) of this section, any payment in kind or portion thereof which is due any person shall be made without regard to ... any claim of lien against the commodity, or proceeds thereof, which may be asserted by any creditor.” 7 C.F.R. § 770.6(f)(1984). Catton argues that this regulation required the bank to file its loan agreement with the county agricultural committee (just as Cargill, we assume, filed the assignment of the contract to it with the committee) and that having failed to do this the bank could not enforce a lien against the proceeds of the contract.
 

 The filing of a financing statement in the places specified by the Uniform Commercial Code is indeed ineffective to protect the lender’s security interest if there is a federal filing scheme, see UCC §§ 9-302(3), (4), but we do not think the regulation quoted above sets up such a scheme. Its aim seems merely to be to protect the Department of Agriculture from liability for paying over the proceeds of a “PIK” contract to an unauthorized payee.
 
 In re Sunberg,
 
 729 F.2d 561, 563 (8th Cir.1984). Suppose the contract is with Farmer X and the Department pays X upon proof that X lived up to his side of the bargain, but then Y comes along and brandishes an assignment from X and complains that the Department paid the proceeds to the wrong person. Naturally the Department wants to shield itself from such complaints by insisting that any as
 
 *1246
 
 signment be filed with its representatives so that if there has been an assignment the Department will not pay the assignor rather than the assignee.
 

 The suggestion that the regulation goes further and requires any secured creditor to file evidence of his security interest with the Department’s representatives on pain of forfeiting his lien is pretty far-fetched. Nothing in the language of the regulation supports this interpretation and the filing form put out by the Department (Form CCC-479) is on its face a form for assigning “PIK” contracts, not a form for recording liens. The Department publishes no form for filing a loan agreement and it would be unreasonable to require the bank to file not merely the evidence of its security interest (that is, the loan agreement) but separate “assignments” to it of the borrower’s contractual rights every time the borrower made a new contract.
 

 This case is not like
 
 Philko Aviation, Inc. v. Shacket,
 
 462 U.S. 406, 103 S.Ct. 2476, 76 L.Ed.2d 678 (1983). Congress had established a central national registry for liens on aircraft; given the mobility of the collateral, the purpose of such a registry is easy to see. There is no indication that Congress has ever wanted to establish a series of county recording systems, federally administered, for “PIK” contracts, and it is hard to understand what useful purpose a federal system of county registries, duplicating the state and county systems used to record liens, would serve. The parties could not even tell us whether the files of the county committees are open to public inspection — a sine qua non of a recording system.
 

 Catton might conceivably have gotten some mileage out of 7 U.S.C. § 1444d(i), which applies to the “PIK” program the payment provisions of the Soil Conservation and Domestic Allotment Act, including a provision which forbids assigning payment rights to “secure any preexisting indebtedness.” 16 U.S.C. § 590h(g). The evident purpose is to make sure that the intended beneficiary of federal largesse retains the benefit. See
 
 Barlow v. Collins,
 
 397 U.S. 159, 162-65, 90 S.Ct. 832, 835-36, 25 L.Ed.2d 192 (1970). If there is no fresh consideration for the assignment, he does not. In this case, however, putting to one side the fact that Catton is a substantial corporation rather than a tenant farmer as in the
 
 Barlow
 
 case, the assignment — if that is what one should call the provision in the loan agreement giving the bank a security interest in any contract rights (implicitly including “PIK” contract rights) that Cat-ton might acquire — was made not to secure a preexisting indebtedness but as part of the inducement to the bank to make the loan; so the “farmer” got value for the assignment. In any event, Catton, not having cited either of the above statutory provisions to us, has waived any reliance it might have placed on them.
 

 Catton’s other argument against the bank’s lien is built on the after-acquired property provision of the Bankruptcy Code, 11 U.S.C. § 552(b), which provides that if before bankruptcy the debtor gave a creditor a security interest that includes proceeds, the security interest extends to proceeds “acquired by the estate after the commencement of the case to the extent provided by such security agreement and applicable non-bankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.” The security interest that Catton gave the bank and the bank perfected did include proceeds — the proceeds of its contract with the Department of Agriculture — and therefore those proceeds, even if acquired after the date of bankruptcy, are part of the lender’s security unless the court decides that it would be inequitable to enforce a security interest in them. See
 
 In re Sunberg, supra,
 
 729 F.2d at 562;
 
 In re Chaseley’s Foods, Inc.,
 
 726 F.2d 303, 305 (7th Cir.1983) (per curiam).
 

 The equity exception is meant for the case where the trustee or debtor in possession uses other assets of the bankrupt estate (assets that would otherwise go to the general creditors) to increase the value of the collateral. See, e.g.,
 
 In re Village Properties, Ltd.,
 
 723 F.2d 441, 444
 
 *1247
 
 (5th Cir.1984). Suppose a creditor had a security interest in raw materials worth $1 million, and the debtor invested $100,000 to turn those raw materials into a finished product which he then sold for $1.5 million. The proceeds of this sale (after deducting wages and other administrative expenses) would be added to the secured creditor’s collateral unless the court decided that it would be inequitable to do so — as well it might be, since the general creditors were in effect responsible for much or all of the increase in the value of the proceeds over the original collateral.
 

 Catton contends that the money it got for assigning its “PIK” contract to the grain elevator company went to plant crops in which the bank retains a lien, thus bringing the case within the exception. The contention seems wide of the mark. This is not a case of the debtor’s putting his own money (more precisely, the money of his other creditors) to work to increase the value of the secured creditor’s collateral. It is a case of the debtor’s using the proceeds from selling one piece of collateral (the “PIK” contract) to create a new piece of collateral (a crop that, if financed by the sale of the bank’s original collateral, would be substituted collateral that would be fully a part of the bank’s security interest). Anyway this contention was not, so far as we can tell, made to the bankruptcy court; and the equitable discretion to which the debtor must appeal to come within the exception to section 552(b) is the discretion of the bankruptcy court, not of this court. If the question is still open in the bankruptcy court, a matter on which we express no view, then Catton can raise it there; it cannot raise it here.
 

 Catton makes the even bolder argument that the proceeds of executory contracts made before bankruptcy can never be the subject of a security interest that survives bankruptcy. We reject the argument. Liens — including, with exceptions not immediately relevant here, .liens in proceeds, see UCC § 9-306(4) — are said to pass through bankruptcy unaffected, meaning that the secured creditor can if he wants ignore the bankruptcy proceeding and enforce his security interest. In effect, though not necessarily immediately, he takes the secured assets (to the extent necessary to pay off the balance of the loan) out of the pool of assets to which the bankrupt’s other creditors have access in the bankruptcy proceeding. See, e.g.,
 
 Long v. Bullard,
 
 117 U.S. 617, 620-21, 6 S.Ct. 917, 918, 29 L.Ed. 1004 (1886);
 
 In re Tarnow,
 
 749 F.2d 464, 465 (7th Cir.1984);
 
 In re Simmons,
 
 765 F.2d 547, 556-59 (5th Cir.1985); 11 U.S.C. § 506(d). Although it is no longer feasible in most cases for the secured creditor actually to ignore the bankruptcy proceeding even if his security interest exceeds the unpaid balance of the debt to him, see Shanor,
 
 A New Deal for Secured Creditors in Bankruptcy,
 
 28 Emory L.J. 587, 620-21 n. 137 (1979), the old saw about liens passing through bankruptcy unaffected continues to hold as an approximation. But it would not even be that if a security interest otherwise comprehensive did not embrace the proceeds of a contract merely because the contract was still executory when the debtor went bankrupt. The debtor could divest himself of all the assets constituting the creditor’s collateral by making executory contracts, and the creditor would have no recourse.
 

 It is true that the bankruptcy judge can (with limitations unnecessary to go into here) allow a debtor to disaffirm an executory contract. See 11 U.S.C. § 365. But that was not done here. The bank was lucky that it was not done. But for the “PIK” contract, it might have lost its lien. The declaration of bankruptcy on April 30 preceded the spring planting. Until crops were planted the bank would have no lien on them unless the debtor financed the planting out of the proceeds of assets covered by the bank’s security interest, so that the bank could trace those proceeds into the new crops. Fortunately for the bank, under the loan agreement its security interest was not limited to crops, equipment, or other tangibles, but embraced accounts and receivables, expressly including contract rights. The provisions of the Uniform
 
 *1248
 
 Commercial Code on secured transactions define “accounts” to include rights under purely executory contracts. See UCC § 9-106. We can think of no reason for having a different definition for purposes of bankruptcy law. The bank had a lien in the proceeds of the “PIK” contract, and we turn to the issue whether the bankruptcy judge’s order as modified and affirmed by the district judge is a proper measure for enforcing the lien.
 

 Catton argues that all it can possibly owe the bank is the money it got from discounting the “PIK” contract to Cargill (perhaps as little as $200,000), and not the larger amount of money that the proceeds in kind were actually worth either in June when the assignment to Cargill was made and the proceeds were anticipated rather than received or in October when the proceeds were actually delivered to Cargill. Because money today is worth more than money tomorrow (you can earn interest on the former), an assignment of the proceeds before delivery would have to be at a discount. A complicating factor on which the record is, however, silent is that the price of corn may have dropped between June and October. This possibility to one side, the discount that any farmer would have had to accept in order to sell October corn in June may have been much smaller than the discount at which Catton sold its “PIK” entitlement to Cargill — a transaction that on Catton’s part may well have been a last-ditch effort to stay in business.
 

 This shows why Catton is wrong to argue that its liability to the bank is limited to the price received from Cargill. The loan agreement expressly forbids Catton to dispose of collateral, other than to sell inventory in the ordinary course of business (e.g., sell crops). Even that is forbidden after default occurs; and Catton was in default on its loan from the bank before it assigned the “PIK” contract to Cargill. The reason for the prohibition is precisely to prevent the debtor from dealing away collateral at bargain-basement prices in a desperate move to stave off a complete collapse.
 

 What the right remedy is for this kind of misconduct may depend on how the misconduct is characterized. One possibility might be to view it as a conversion of the collateral (the bank’s brief characterizes it as conversion and breach of contract interchangeably, and of course they are not mutually exclusive characterizations). There are two problems with this. First, the damages for conversion presumably would be the value of the thing converted on the date converted, which means, the value of the “PIK” contract in June, when Catton assigned it to Cargill without the bank’s authorization — not the value of the proceeds in kind in October, which is the value that the bankruptcy judge awarded. Maybe in a different case the argument could be made that when the thing converted is a contract for future delivery, the holder of the contract right should be entitled to the value of the contract on the date of delivery, since that is what he bargained for. But there is no indication that the bank bargained for the future-delivery feature of the “PIK” contract. Indeed, the bank did not know or care before the default whether Catton planted and sold crops or sold non-crops. When Catton signed the “PIK” contract it added to the bank’s collateral the value of the contract on the date of signing, and when it converted the collateral (if that is what it did) it imposed a loss on the bank equal to the value of this collateral on the date of conversion.
 

 Another problem with arguing conversion is that the district judge suggested that under the law of Illinois an intangible right, as the “PIK” contract was before payment in kind became due in October, is not the kind of asset that can be converted; and we do not understand either party to be questioning this suggestion. The suggestion naturally led the district judge to describe the bankruptcy judge’s award as one of damages for breach of contract, and to affirm on that understanding. The judge’s characterization of the order (a characterization that has, as we have said, not been made an issue in this appeal)
 
 *1249
 
 meshes nicely with the damage award, which gives Catton what it would have had — a security interest in more than $300,-000 worth of corn — if Catton had not broken its contract with the bank by violating the provision of the loan agreement which forbade it to dispose of collateral. Of course it is possible that the bank would have let Catton sell the “PIK” contract in June to get money to plant new crops, but this is speculative and doubts must be resolved against the contract breaker.
 

 We conclude from all this that the amount in the bankruptcy judge’s order is the proper starting point for computing Catton’s liability; but it is not necessarily the proper end point. A minor wrinkle to be noted merely in passing is that the bankruptcy judge’s order actually directed Cat-ton to pay over to the bank either the value of the corn on the date it was delivered to Cargill or the “PIK” entitlement itself (which we understand to mean, the same amount of corn that the “PIK” contract entitled the holder of the contract right— first Catton, and then Cargill — to receive). As nearly as we can understand the purpose of this option, it was to recognize that the proceeds of the unauthorized assignment, having been used to plant a new crop, created new collateral for the bank. But the option should not be the debtor’s. Catton should not be allowed to benefit if the price of corn has fallen since October 1983 when the delivery of the “PIK” proceeds was due. But for its breach of contract Catton would have received those proceeds itself and they would have been added to the bank’s collateral. To give Catton a choice of corn or cash is to enable it to speculate with no downside risk: if the price of corn falls below its October 1983 price, Catton pays the bank in corn; if the price of corn rises above that price, in cash. The district judge quite properly struck the option part of the bankruptcy judge’s order.
 

 But if as Catton argues it used all (but about $24,000) of the proceeds of the assignment to plant new crops in which the bank has, as we said earlier, a lien, it conferred a benefit on the bank, and is entitled to an offset. See 11 U.S.C. § 506(c);
 
 In re Trim-X, Inc.,
 
 695 F.2d 296, 299 (7th Cir.1982). No offset was allowed; but we do not think that this provides a ground for reversing the district court’s judgment. So far as appears, Catton did not ask the bankruptcy judge to make such an offset. Whether it has waived its claim to an offset by its failure (so far as we can tell) to claim it in the bankruptcy court is not a question we need decide; the proceeding continues in the bankruptcy court and it is there, not here, that Catton must appeal in the first instance for relief from any aspects of the bankruptcy judge’s order that it doesn’t like.
 

 Another question we need not decide, but mention so that our silence will not be taken to have decided it, is the priority to which the bank is entitled. The order creates a new claim against the bankrupt estate. If the claim is for damages for breach of contract committed after the declaration of bankruptcy, then it may conceivably be entitled to the very high priority accorded to some other “post-petition” claims, notably tort claims. See
 
 Reading Co. v. Brown,
 
 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968);
 
 Diners Club, Inc. v. Bumb,
 
 421 F.2d 396, 402 (9th Cir.1970);
 
 In re Chicago Pac. Corp.,
 
 773 F.2d 909, 913-14 (7th Cir.1985); but see
 
 In re Chicago, Rock Island & Pac. R.R.,
 
 756 F.2d 517, 519-20 (7th Cir.1985). Only
 
 Diners Club,
 
 however, gave such a priority to a breach of contract claim, and it did so without explanation; in
 
 Reading
 
 the Court had stressed the involuntary nature of the tort victim’s relationship to the bankrupt, see 391 U.S. at 478, 88 S.Ct. at 1763, a consideration emphatically not present in this case. It is a little hard to see why Catton’s general creditors should bear the full brunt of its breach of the loan agreement with the bank, if all that is involved is a breach of contract. But against this it can be argued that if Catton had righted itself by the assignment to Cargill, the general creditors would have benefited; and perhaps they should therefore bear the costs of this maneuver. This is a traditional ground for
 
 *1250
 
 treating a post-petition expenditure as an administrative expense. See
 
 In re Chicago, Rock Island & Pac. R.R., supra,
 
 756 F.2d at 519-20.
 

 An alternative possibility is that the bankruptcy judge’s order was an order in the nature of specific performance — an order to the debtor to replace collateral wrongfully taken from a secured creditor, the bank. Whether this is the true character of the order, whether if so it is a proper remedy for a breach of contract involving the wrongful dealing away of a secured creditor’s collateral, and whether it makes any difference whether the damage award is conceived of as being an addition to the bank’s collateral or an administrative expense of the bankrupt estate (assuming it is not just an unsecured claim) are questions for the bankruptcy judge and the district judge to consider as and if the questions become relevant in the ongoing bankruptcy proceeding.
 

 We add that we do not think the priority of the claim depends on whether the bank can trace the proceeds of the assignment of the “PIK” contract from their receipt by Catton to their embodiment in some existing asset of Catton. True, only if it could “identify” the proceeds in this manner would the bank be entitled to the status of a secured creditor with regard to the proceeds. See UCC § 9-306(2);
 
 C.O. Funk & Sons, Inc.,
 
 89 Ill.2d 27, 30-33, 59 Ill.Dec. 85, 431 N.E.2d 370, 372 (1982). But it is not the proceeds of the assignment to Cargill that is the collateral which the bank is laying claim to in this proceeding. It is rather the proceeds in kind themselves that is the collateral the bank claims it would have had but for Catton’s wrongful conduct.
 

 Although some uncertainties remain concerning the bankruptcy judge’s order as affirmed by the district judge, they are not great enough to warrant reversal. Catton’s claim that it should be allowed an offset, while not implausible, may have been waived and in any effect cannot be raised for the first time in this court; and the priority of the bank’s claim is a separate question from its validity. Although it would have been better if all the loose ends had been tied up before Catton appealed to us, the district judge’s order affirming with modifications the bankruptcy judge's order is final (and therefore appealable to us under 28 U.S.C. § 158(d)) within the somewhat relaxed sense of finality that traditionally characterizes bankruptcy appeals and continues to do so notwithstanding the comprehensive overhaul in the bankruptcy appellate process brought about by the revisions of the bankruptcy code made in 1978 and since. See
 
 In re Riggsby,
 
 745 F.2d 1153 (7th Cir.1984);
 
 In re Saco Local Development Corp.,
 
 711 F.2d 441 (1st Cir.1983). How much Catton will ultimately have to pay the bank is unclear; but this is typically the case in bankruptcy and, as Judge Breyer explained in
 
 Saco,
 
 does not make an order allowing a claim against the bankrupt estate unappealable. It would be different if the district judge had remanded the case to the bankruptcy judge. See
 
 In re Fox,
 
 762 F.2d 54 (7th Cir.1985). But there was no remand; and the fact that an order is unclear, or may later be modified, does not make it nonfinal.
 

 AFFIRMED.