No. 61,191

RURAL GAS, INC., a Kansas Corporation, *Appellant/Cross-appellee*, v. NORTH CENTRAL KANSAS PRODUCTION CREDIT CORPORATION, Concordia, Kansas, *Appellee/Cross-appellant*.

(755 P.2d 529)

Opinion filed April 29, 1988.

*J. Stan Sexton,* of Hampton, Royce, Engleman & Nelson, of Salina, argued the cause, and *Fred D. Swoyer,* of Swoyer & Simms, of Belleville, was with him on the briefs for appellant.

*Don W. Noah,* of Noah & Harrison, P.A., of Beloit, argued the cause, and *Mark J. Noah,* of the same firm, was with him on the brief for appellee.

*Dee W. James,* of Abilene, was on the *amicus curiae* brief for The Kansas Fertilizer and Chemical Association.

The opinion of the court was delivered by

HOLMES, J.: Rural Gas, Inc., (RGI) appeals from an order granting summary judgment to North Central Kansas Production Credit Association, Concordia, Kansas, (PCA) in a declaratory judgment action filed by RGI pursuant to K.S.A. 60-1701 *et seq.* PCA cross-appeals from a dismissal, pursuant to K.S.A. 60-212(b)(6), of its counterclaim for punitive damages.

This case involves a dispute between two creditors over cash payments paid on behalf of Hansen Farms, a Kansas farm partnership, by the United States Department of Agriculture through the Agricultural Stabilization and Conservation Service (ASCS). The sum of $42,721.75, for wheat and feed grain deficiency payments, was paid to RGI pursuant to ASCS assignments executed by the Hansen Farms partners. PCA contended it had a prior perfected security interest in the ASCS payments and that it should have received the payments. RGI initiated this declaratory judgment proceeding after PCA threatened to sue RGI for conversion. RGI sought, *inter alia,* a determination that it was entitled to the payments under the terms of the ASCS assignments and pursuant to federal law. PCA counterclaimed, alleging RGI had converted moneys in which PCA, under Kansas law, had a prior perfected security interest, and seeking actual and punitive damages. The district court granted PCA's motion for summary judgment on the question of whether RGI was liable for actual damages for conversion, but held as a matter of law that PCA was not entitled to punitive damages under the circumstances of this case.

There is no significant dispute as to the material facts relevant to RGI's appeal. PCA did not controvert alleged facts as submitted by RGI in its motion for summary judgment except as noted in number 4 below. The facts, as submitted, read:

"1. On or about December 1, 1983, Hansen Farms, an apparent partnership of members of the Hansen family, made, executed and delivered to PCA their renewal promissory note in the face amount of $1,626,344.00, to mature on December 1, 1984."

"2. On December 1, 1983, Hansen Farms was indebted to PCA in the principal sum of $553,685.44, together with accrued interest in the sum of $91,573.56 by reason of a promissory note dated May 19, 1983, which note matured on that date [December 1, 1983]."

"3. PCA made various cash advances to the Hansens after December 1, 1983 and up to December 27, 1984, primarily for the purchase of livestock as shown on the PCA/Hansen Ledger Sheets 237-257."

"4. Prior to December 1, 1983, Hansen Farms had not granted PCA a security interest in federal government farm program payments. However, concurrently with the renewal of their pre-existing indebtedness, Hansens granted PCA a security interest in:

'Contract rights & receivables in all government farm program payments which would include but is not limited to: Pay-In-Kind (PIK) program, and Deficiency Payments, Government Storage Payments & Proceeds from CCC loans on commodities.'

This security interest was '. . . to secure payment and performance of all obligations, indebtedness and liabilities of any kind, whenever and however incurred, absolute or contingent, due or to become due, now existing or hereafter arising of the Debtor [Hansens] to the Secured Party [PCA], including the liabilities arising because of funds advanced at the option of Secured Party.' "

[PCA responded as follows: "4. Controverted. The loan of the Hansens was renewed on December 1, 1983. At this time, the quoted language was included in the Security Agreement. For some years prior to 1983, ASCS payments had not been a major income item to farmers and were not taken for collateral."]

"5. PCA made its last cash advance to the Hansens pursuant to the terms and conditions of the December 1, 1983, promissory note and security agreement on December 27, 1984, in the amount of $5,150.00 to enable the Hansens to purchase feed for their livestock operation."

"6. PCA made no further cash advances to the Hansens after December 27, 1984, and on or about January 14, 1985, informed agricultural suppliers and vendors that PCA would extend no further credit to the Hansens to finance their crop production or livestock operation during the year 1985 or thereafter."

"7. After being denied further extensions of credit by PCA, and in an effort to produce 1984 and 1985 crops, the Hansens approached RGI to request that agricultural chemicals, fertilizers and propanes be sold to them. Billy Hansen, Dennis Hansen and Randy Hansen met with Max L. Ball, President of RGI, and David J. McMullen, County Executive Director of the Republic County ASCS Office, to discuss a method by which the Hansens could purchase agricultural inputs for the making of such crops from RGI using ASCS deficiency payments for the Hansens' participation in wheat and feed grain programs."

"8. On March 27, 1985, the Hansens executed three Form ASCS 36 assignments in which they assigned the rights to receive deficiency payments on 1984 and 1985 wheat and feed grain programs to Rural Gas, Inc. in payment of agricultural inputs to be provided to them by RGI."

"9. Prior to executing these assignments, McMullen of ASCS explained to the Hansens and to Ball that no portion of the program payments could be used to pay or secure any of the Hansens' pre-existing indebtedness to a creditor, but that such proceeds could be used, under ASCS regulations, only to pay for propane, agricultural chemicals and fertilizers necessary for the making of the crops to which the deficiency payments related."

"10. After receiving the assignments, RGI supplied to the Hansens, propane, agricultural chemicals and fertilizers to make the 1984-85 wheat and feed grain crops to which the deficiency payments related."

While the renewal note to PCA dated December 1, 1983, is in an amount of $1,626,344.00, referred to in the note as the "Original Commitment," it further recites that the sum of $553,685.44 is "a renewal of an existing indebtedness." In addition, answers to interrogatories reveal that on December 1, 1983, $91,573.56 was due PCA in interest on the past due indebtedness for a total amount of $645,259.00 owed by Hansen Farms to PCA on December 1, 1983.

RGI admitted during discovery that it made no investigation of public records to determine whether Hansen Farms had conveyed to PCA or anyone else a security interest in its government program payments. RGI also admitted it had actual knowledge that PCA claimed a security interest in the Hansen Farms government program payments no later than April 25, 1985, when PCA's counsel communicated that information to RGI's general manager by telephone and a followup letter. RGI nevertheless received and retained cash payments totaling approximately $43,000 pursuant to the ASCS assignments between mid-April 1985 and early 1986.

RGI raises three issues on appeal:

1) Whether a producer's property interest in federal farm program payments, and specifically a producer's right to assign or encumber such program payments as security, is to be determined by federal rather than state law;

2) whether 16 U.S.C. § 590h(g) (1982) and 7 C.F.R. § 709.3(a) (1988) limit a producer's right to assign or encumber as security the producer's right to receive federal farm program payments, and if so, to what extent; and

3) whether the district court erred in defining the term "preexisting indebtedness" as used in 16 U.S.C. § 590h(g) and 7 C.F.R. § 709.3(a), which prohibit the assignment of certain federal farm program payments to pay or secure preexisting indebtedness.

At oral argument before this court, and in the briefs, the parties agree that PCA has met the statutory filing requirements under the Kansas Uniform Commercial Code (UCC), K.S.A. 84-1-101 *et seq.*, and that if the UCC controls, the appeal of RGI fails. The parties also agree that the ASCS assignments executed by the Hansen Farms partners were properly executed and filed, and that if the federal statutes and regulations control, then RGI should prevail on its appeal.

The wheat and feed grain deficiency payments involved in this action are authorized by 7 U.S.C. 1444d (1982) and 16 U.S.C. § 590h(g), which is specifically incorporated in the former statute by reference. The particular section of the statutes with which we are involved, 16 U.S.C. § 590h(g), provides:

"**(g) Assignment of payment; procedure for assignment; rules and regulations.**

"*A payment which may be made to a farmer under this section, may be assigned, without discount, by him in writing as security for cash or advances to finance making a crop, handling or marketing an agricultural commodity, or performing a conservation practice.* Such assignment shall be signed by the farmer and witnessed by a member of the county committee or by an employee of such committee, except that where the assignee is a bank whose deposits are insured by the Federal Deposit Insurance Corporation, the Farmers Home Administration, or a production credit association supervised by the Farm Credit Administration, such assignment may be witnessed by a bonded officer of the lending institution. Such assignment shall be filed with the county committee. *Such assignment shall not be made to pay or secure any preexisting indebtedness.* This provision shall not authorize any suit against or impose any liability upon the Secretary or any disbursing agent if payment to the farmer is made without regard to the existence of any such assignment. The Secretary shall prescribe such regulations as he determines necessary to carry out the provisions of this subsection." (Emphasis added.)

Pursuant to the authority specifically granted in the statute, regulations have been adopted, including 7 C.F.R. § 709.3, which reads in part:

"**Purposes for which a payment may be assigned.**

"(a) *A payment which may be made to a producer* under any program to which this part is applicable *may be assigned only as security for cash or advances to*

*finance making a crop,* handling or marketing an agricultural commodity, or performing a conservation practice, *for the current crop year. No assignment may be made to secure or pay any preexisting indebtedness of any nature whatsoever.*

"(b) To finance making a crop means (1) to finance the planting, cultivating, or harvesting of a crop, including the purchase of equipment required therefor and the payment of cash rent for land used therefor . . . ." (Emphasis added.)

The first issue is whether federal law or state law applies in determining the nature and extent of a producer's property interest in farm program payments provided by the federal government. Appellant RGI asserts that federal law controls. It argues that the trial court's decision violates the supremacy clause of Article VI of the United States Constitution by interfering with federal farm policy as articulated by Congress. In response, PCA argues that state law controls the filing of liens and the priorities thereof unless the federal government has provided for a national registry for filing such security interests, which is not the case here. PCA essentially argues that the federal statute and regulation asserted by RGI as the primary basis for this appeal are merely intended to protect federal agencies from liability for paying farm program payments to the wrong party, and that federal law has therefore not preempted state law on the question of priorities as between two creditors who both claim interests in a common debtor's federal farm program payments.

RGI contends that the federal statutes and regulations preclude PCA from obtaining an interest in the ASCS payments except for indebtedness created to finance the making of the 1984-85 crop and that no part of such payment may be applied to any preexisting indebtedness. PCA takes the position that Hansen Farms had a property interest in the ASCS payments in which PCA properly took a security interest under the provisions of the UCC. It contends that the statutory and regulatory restrictions on the producer's authority to assign the payments are applicable only as between the federal government and the producer, and do not apply to this dispute between competing creditors. It should be noted that we are not called upon, and do not here decide, the question of the validity of the PCA security interest as between PCA and the Hansens. We are faced only with the competing claims of third parties to the ASCS payments due from the federal government to Hansen Farms.

Federal courts have consistently held that property interests may be created by statute. *See, e.g., Goldberg v. Kelly*, 397 U.S. 254, 261-62, 25 L. Ed. 2d 287, 90 S. Ct. 1011 (1970) (federal and state statutory right to public assistance so long as specified qualifications maintained); see also Reich, *Individual Rights and Social Welfare: The Emerging Legal Issues*, 74 Yale L.J. 1245, 1255 (1965) (listing "subsidies to farmers" as one example of property entitlement flowing from government). Implicit in this principle is that the nature and extent of the property interest so created is governed by the statute itself. See *Goldberg*, 397 U.S. at 262 (statutory entitlement to benefits only for those persons qualified to receive them); *Mayo v. United States*, 319 U.S. 441, 87 L. Ed. 1504, 63 S. Ct. 1137 (1943) (soil-building and soil-conserving practices, when carried out by a participating farmer, entitle him to grant or benefit payment); *Aycock-Lindsey Corporation v. United States*, 171 F.2d 518, 521 (5th Cir. 1948) (subsidies under 16 U.S.C. §§ 590a *et seq.* are contractual compensation for compliance with program requirements, not gratuities); *Baboquivari Cattle Co. v. Commissioner of Internal Rev.*, 135 F.2d 114, 116 (9th Cir. 1943) (farmer not entitled to payments under 16 U.S.C. § 590a *et seq.* unless he has complied with conservation-oriented program conditions as to proper use of his land); *Pettersen v. United States*, 10 Ct. Cl. 194, 199 (1986) (compliance with Feed Grain Program is condition precedent for payment of corn and grain sorghum deficiency payments pursuant to 7 U.S.C. § 1444d).

It appears clear that the nature and extent of the Hansen Farms property interest in the ASCS payments are controlled by the federal statute that created them. It is equally clear that the Hansen Farms property interest in those payments is also subject to Kansas law to the extent it does not conflict with the federal statutes and regulations.

K.S.A. 84-9-104 deals with transactions excluded from the scope of article 9:

"This article does not apply

"(a) to a security interest subject to any statute of the United States such as the ship mortgage act, 1920, *to the extent that such statute governs the rights of parties to and third parties affected by transactions in particular types of property* . . . ." (Emphasis supplied.)

Under this provision of the UCC, certain federal statutes may partially preempt state law governing secured transactions. Thus, certain aspects of the producer's property interest in ASCS payments may be controlled by § 590h(g) and its complementing regulations, while others may be controlled by the UCC and applicable Kansas statutes. See 68 Am. Jur. 2d, Secured Transactions § 30, p. 852; Kansas Comment 1983 to K.S.A. 84-9-104(a). The issue we must decide is the extent to which § 590h(g) and 7 C.F.R. § 709.3(a) impose restrictions on Hansen Farms' assignments of the ASCS payments.

PCA relies upon the general proposition that restrictions upon assignment of claims against the government in general, and the restriction in § 590h(g) in particular, are solely for the protection of the government to preclude any action against the government in the event it makes payment to the wrong party. In doing so, PCA relies upon that portion of the statute which states:

"This provision shall not authorize any suit against or impose any liability upon the Secretary or any disbursing agent if payment to the farmer is made without regard to the existence of any such assignment,"

to the exclusion of the other prohibitions contained in the statute.

PCA's argument relies heavily upon *United States v. Crain*, 151 F.2d 606 (8th Cir. 1945). In *Crain*, the assignee of a claim for soil conservation benefits for 1938 under 16 U.S.C. § 590a *et seq.*, who had advanced to Broughton, the assignor, cash, supplies, and services with which he produced a crop in 1938, sued the United States for paying the benefits to the assignor despite its knowledge of the assignment at the time of the payment. The court, quoting 16 U.S.C. § 590h(g) as then worded, held that Congress intended the provision to preclude subjecting the United States government to double liability, and based upon the last sentence of the section (which is now the next to last sentence of the present statute) concluded that the assignee was barred from suing the United States. The court reasoned:

"The effect of Section 8(g) of the Act [16 U.S.C. § 590h(g)] in general, and of the last sentence thereof in particular, is readily ascertained when construed in the light of the general policy of the government regarding assignment of claims against it. That policy is disclosed by the statute voiding assignment of such

claims unless freely made, executed in presence of at least two witnesses, after allowance of claim, ascertainment of amount due and issuance of warrant for payment thereof. 31 U.S.C.A. § 203 [now 31 U.S.C. § 3727]. The purpose of this statute governing assignment of claims against the government is to protect the government and prevent it from becoming embroiled in conflicting claims or subjected to multiple liability. *Rosecrans v. William S. Lozier, Inc.,* 8 Cir., 142 F.2d 118; *Martin v. National Surety Co.,* 300 U.S. 588, 57 S.Ct. 531, 81 L.Ed. 822." 151 F.2d at 608.

*Crain* merely stands for the principle that under the penultimate sentence of § 590h(g), assignees may not sue the federal government for damages for paying the benefits to the assignor. Instead, an assignee must look to his assignor for payment if the federal government fails to pay the assignee directly. *Crain* does not hold that this is the *only* purpose of the statute and did not address the specific purpose of the portions of the statute RGI relies upon in the instant case. Other cases relied upon by PCA also fail to support the contention that the protection of the government against double liability is the only reason for any restrictions upon assignments.

While there are very few cases which address the application and interpretation of § 590h(g), those that have tend to support the contentions of RGI. The cases indicate that assignments of ASCS payments are subject to specific statutory restrictions and those restrictions are controlling as to the rights of third parties affected thereby, to the exclusion of UCC Article 9 state law requirements.

The earliest of these decisions is *In re Bechtold,* 54 Bankr. 318 (Bankr. D. Minn. 1985). That case resolved a dispute between the debtors and their lending bank over payments due the debtor under the federal milk diversion program. The debtor argued that the language of the security agreement with the bank did not cover the milk diversion payment since it did not include accounts or general intangibles, but even if the security agreement did cover the payments, the bank was prevented from obtaining a security interest therein based on 7 C.F.R. § 709.3(a). The court agreed with both contentions, concluding:

"Even if the security agreement by its terms did cover the milk diversion payment, I think that it would not attach to the payment as a matter of federal law. [Citing provisions of 7 C.F.R. § 709]. . . . Although I concede that there is some ambiguity in the language itself, I think that taken as a whole the regulations

clearly indicate that the Secretary of Agriculture in adopting the regulations intended that milk diversion payments be free of claims by others and therefore provide cash for farmers to use to finance a new crop."

"This regulation was apparently not raised in . . . any . . . reported case that I have been able to find." 54 Bankr. at 321.

The *Bechtold* court cited nothing other than the regulations themselves in support of its interpretation of the apparent intent of the Secretary of Agriculture. Nor did it even cite, let alone analyze, the statute, 16 U.S.C. § 590h(g).

Two months after the *Bechtold* decision, the Court of Appeals for the Seventh Circuit decided *J. Catton Farms v. First Nat. Bank of Chicago*, 779 F.2d 1242 (7th Cir. 1985), a bankruptcy case in which a secured creditor sought the proceeds of the debtor's payment in kind (PIK) contract not to grow crops. The bankruptcy judge ordered the farming operation to pay the proceeds of the PIK contract to the secured creditor, and both the district court and the court of appeals affirmed. However, buried in the Seventh Circuit panel's lengthy opinion is the following dictum:

"Catton might conceivably have gotten some mileage out of 7 U.S.C. § 1444d(i), which applies to the 'PIK' program the payment provisions of the Soil Conservation and Domestic Allotment Act, including a provision which forbids assigning payment rights to 'secure any preexisting indebtedness.' 16 U.S.C. § 590h(g). The evident purpose is to make sure that the intended beneficiary of federal largesse retains the benefit. See *Barlow v. Collins*, 397 U.S. 159, 162-65, 90 S. Ct. 832, 835-36, 25 L. Ed. 2d 192 (1970). If there is no fresh consideration for the assignment, he does not. In this case, however, putting to one side the fact that Catton is a substantial corporation rather than a tenant farmer as in the *Barlow* case, the assignment—if that is what one should call the provision in the loan agreement giving the bank a security interest in any contract rights (implicitly including 'PIK' contract rights) that Catton might acquire—was made not to secure a preexisting indebtedness but as part of the inducement to the bank to make the loan; so the 'farmer' got value for the assignment. In any event Catton, not having cited either of the above statutory provisions to us, has waived any reliance it might have placed on them." 779 F.2d at 1246.

A year later, a Florida bankruptcy court in *Matter of Azalea Farms, Inc.*, 68 Bankr. 32 (Bankr. M.D. Fla. 1986), considered a case raising virtually the identical question presented in *In re Bechtold*. Citing the latter case as support, it reached the same conclusion: the security agreement as worded did not cover milk diversion payments, but even if it did, "the interest created

would not attach to the milk diversion payment as a matter of federal law." 68 Bankr. at 34. As in *Bechtold,* the court noted that the debtor's milk diversion program contract with the responsible federal agency contained an "Assignment of Payment" provision permitting assignment of milk diversion payments in accordance with 7 C.F.R. § 709. After quoting § 709.3(a), the court concluded:

"The regulations, taken as a whole, clearly indicate that the Secretary of Agriculture in adopting the regulations intended that milk diversion payments be free of claims and therefore provide cash to farmers in order to finance farm operations." 68 Bankr. at 34.

In a very recent case an Iowa bankruptcy court addressed the issue in *Matter of Halls,* 79 Bankr. 417 (Bankr. S.D. Iowa 1987). It is the first published decision we have found squarely holding that § 590h(g) precludes assignment of federal feed grain program payments as security for a loan unless the loan proceeds are used to finance a crop in a year for which the program payments were due. It is also the first case that analyzes the language of § 590h(g) and its implementing regulations in conjunction with one another.

In *Halls,* a lending bank's successor in interest, the FDIC, challenged the debtors' use of federal feed grain program payments in which it claimed a perfected security interest. The debtors received cash program payments for 1986 and 1987, but contended that FDIC's predecessor was barred from encumbering 1987 payments because it had not provided financing for the debtor's 1987 crop. The court initially stated:

"The purpose underlying [§ 590h(g)] is to ensure that the intended beneficiary of government payments receives the payments. *J. Catton Farms v. First Nat. Bank of Chicago,* 779 F.2d 1242, 1246 (7th Cir. 1985)." 79 Bankr. at 419.

The court then agreed with the debtors' argument, specifically citing the language of 7 C.F.R. § 709.3(a).

"For program payments that relate to crops that the creditor had no part in making, such payments cannot be subjected to the creditor's security interest. Section 709.3(a) does permit the FDIC to encumber the 1986 payments because the FDIC's predecessor in interest advanced money for putting in the 1986 crop." 79 Bankr. at 419.

The court went on to note that while state law on secured transactions does not limit a creditor's ability to encumber gov-

ernment payments, citing the Iowa version of the UCC, "[t]his conflict between the federal scheme and state law must be resolved in favor of federal law." 79 Bankr. at 419. In reaching its conclusion, the court stated:

"Application of these provisions [7 C.F.R. § 709] to the instant case means that the FDIC cannot encumber 1987 program payments made in cash since the FDIC did not finance the 1987 crop. The language of 7 C.F.R. section 709.3(a) clearly shows that the only payments that may be encumbered are those directly related to the crop that a lender assisted in making by lending money. The provision states that program payments '[may] be only assigned as security for cash or advances to finance making a crop . . . *for the current year.' Id.* (emphasis added).
Moreover, the regulations state that 'no assignment may be made to secure or pay *any pre-existing indebtedness of any nature whatsoever.' Id.* (emphasis added). For program payments that relate to crops that the creditor had no part in making, such payments cannot be subjected to the creditor's security interest. . . .

"It is important to note that state law regarding secured transactions contains no such limitation on a creditor's ability to encumber government payments. *See generally* Iowa Code sections 554.9101 *et seq.* This conflict between the federal scheme and state law must be resolved in favor of the federal law. It is a fundamental precept that to the extent a conflict exists between state and federal law, state law must yield. U.S. Const., art. VI, cl. 2; *Maryland v. Louisiana,* 451 U.S. 725, 747, 101 S. Ct. 2114, 2129, 68 L. Ed. 2d 576 (1981); *Johnson v. First Nat. Bank of Montevideo, Minn.,* 719 F.2d 270 (8th Cir. 1983) *cert. denied* 465 U.S. 1012, 104 S. Ct. 1015, 79 L. Ed. 2d 245 (1984)." 79 Bankr. at 419-20.

The holding and reasoning in *Halls* is equally applicable to the statutory and regulatory restrictions on assigning the ASCS payments to pay a preexisting indebtedness.

Most recently, in *In re George,* 85 Bankr. 133 (Bankr. D. Kan. 1988), the court was faced with a dispute as to the validity of certain creditors' security interests in PIK certificates issued to the bankrupt and held by the trustee. The case involved recent regulations promulgated by the Commodity Credit Corporation (CCC) which are not applicable to the case before us. In discussing the issue of whether the federal CCC regulations preempt the state law of secured transactions, the court stated:

"It is a fundamental precept that to the extent a conflict exists between state and federal law, state law must yield. U.S. Const., Art. VI, cl. 2; *Maryland v. Louisiana,* 451 U.S. 725, 747, 101 S. Ct. 2114, 2129, 68 L. Ed. 2d 576 (1981); *Johnson v. First National Bank of Montevideo, Minn.,* 719 F.2d 270 (8th Cir.

1983), *cert. denied,* 465 U.S. 1012, 104 S. Ct. 1015, 79 L. Ed. 2d 245 (1984). Laws enacted pursuant to the powers conferred by the Constitution on Congress are the supreme law of the land and will prevail over state law. *Testa v. Katt,* 330 U.S. 386, 67 S. Ct. 810, 91 L. Ed. 967 (1947). The states may not interfere with the United States government in the exercise of its constitutional powers (e.g., foreign affairs, regulation of aliens, war powers, armed forces) and all matters touching the rights and obligations of the United States. *Spector Motor Service v. O'Connor,* 340 U.S. 602, 71 S. Ct. 508, 95 L. Ed. 573 (1951), and U.S. Const., Art. VI, cl. 2. State action must give way to federal legislation where a valid act of Congress is in actual conflict with the law of the state. *Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142-43, 83 S. Ct. 1210, 1217, 10 L. Ed. 2d 248 (1963); *McDermott v. Wisconsin,* 228 U.S. 115, 132, 33 S. Ct. 431, 435, 57 L. Ed. 754 (1913).

"State law may be preempted by an express statement, by federal occupation of the field, or by direct conflict with federal law. *Louisiana Public Service Commission v. Federal Communications Commission,* 476 U.S. 355, 106 S. Ct. 1890, 90 L. Ed. 2d 369 (1986)." 85 Bankr. at 138-39.

In finding that the creditors' security interests under the UCC prevailed over the CCC regulations, the court stated:

"Were Congress so inclined, it could clearly manifest an intent to control the use of the proceeds from the benefit program. Indeed, in other situations it has expressly stated its intention of controlling the use of proceeds from other benefit programs. *See e.g.,* 16 U.S.C. § 590h(g) (Supp. 1987) (assignments of cash payments made under the Soil Conservation Act for preexisting debt are expressly prohibited). See also 7 C.F.R. § 709.3(a) (1986)." 85 Bankr. at 140-41.

While the statements relative to § 590h(g) and 7 C.F.R. § 709.3(a) are clearly dicta, they are consistent with the few cases that have considered or commented upon the effect of the restrictions in the statute and regulations now before this court.

We are of the opinion that 16 U.S.C. § 590h(g) and 7 C.F.R. § 709, relied upon by RGI in its decision to finance the Hansen Farms' crops, were intended by Congress to limit the circumstances under which an agricultural producer can assign government payments as collateral and to prevent creditors from making the production of the crop for which the payments were made impossible. To the extent that the federal statute and regulations are in conflict with the Kansas UCC, they are superior and controlling as to the rights of the parties herein.

We conclude that as to competing creditors to benefits under the statute, the language of the statute and the regulations impose restrictions on a participant against (1) assigning his contract rights to pay or secure a preexisting debt, and (2)

assigning his contract rights "as security for cash or advances to finance making a crop" for any year other than the "current crop year." 16 U.S.C. § 590h(g) and 7 C.F.R. § 709.3(a).

We now turn to the issue of whether the limitations upon assignment as set forth in the statute and regulations preclude PCA from asserting its prior security interest against RGI. The district court, in granting summary judgment in favor of PCA, concluded:

"1. A pre-existing debt is one without security, which is attempted to be brought into security status with a later debt instrument.

"2. PCA's debt documents show they were made contemporaneously, therefore the debt in question is not a preexisting debt. Under 11 U.S.C. § 590h(g) an assignment or security agreement may include an after-acquired property clause. Such clause included the 1985 crop. PCA's debt documents were properly filed and by law RGI had notice.

"3. The security interest of PCA takes priority over the interest of RGI."

The court then sustained PCA's motion for partial summary judgment and entered judgment against RGI for $42,721.75 plus prejudgment interest.

We conclude the district court was in error in finding there was no preexisting debt at the time Hansen Farms signed the PCA security agreement in December 1983. The security agreement itself specifically refers to the renewal of an existing indebtedness of at least $553,685.44. PCA asserts, and the trial court apparently agreed, that for an indebtedness to be preexisting it initially must have been wholly unsecured, and be unsecured when security is taken for it at some later date. This entire argument is based upon an unpublished decision of the United States Bankruptcy Court for the District of Kansas in *In Re Holman*, No. 86-40959 (Bankr. D. Kan. 1987). *Holman* is not precedent, and, in addition, we do not find it persuasive.

7 C.F.R. § 709.3(a) provides in part:

"No assignment may be made to secure or pay any preexisting indebtedness of any nature whatsoever."

The statute, 16 U.S.C. § 590h(g) is equally clear, stating, "Such assignment shall not be made to pay or secure any preexisting indebtedness." Our research has disclosed no reported decisions which have considered the meaning of the term "preexisting indebtedness" in relation to the applicable statute and regula-

tions with the exception of the dictum in *J. Catton Farms*, 799 F.2d 1242.

The term "preexisting indebtedness" does not have any unusual or technical meaning when applied to the statute and regulations now before us. The fact that the amount of $553,685.44 plus interest, which was past due on December 1, 1983, was secured by other assets of Hansen Farms at the time of the renewal of the note and the addition of the ASCS payments as collateral does not alter the status of the past due amount as a preexisting debt. We hold that the security interest of PCA in the ASCS payments was taken as security for preexisting indebtedness and as such is unenforceable against RGI, which advanced funds or agricultural inputs for the making of the crops which were the basis for the ASCS payments at issue in this case.

Although not directly before us in this appeal, we also conclude that PCA would be precluded from recovering the ASCS payments from RGI as there is no showing PCA advanced funds for "making a crop . . . for the current crop year." 7 C.F.R. § 709.3. Under either restriction in the statute and regulations PCA is precluded from recovering the ASCS payments from RGI.

In view of the decision reached herein, the cross-appeal of PCA obviously is moot and the district court was correct in dismissing the claim of PCA for punitive damages.

The judgment is reversed on the appeal of RGI and affirmed on the cross-appeal of PCA and the case is remanded with directions to grant summary judgment for RGI.

HERD, J., dissenting.