**In re Laurence B. MILLER, Debtor,**

**In re Barbara MILLER, Debtor.**

**David GROCHOCINSKI, Trustee of the Estates of Laurence Miller and Barbara Miller, Plaintiff,**

**v.**

**Galvin KENNEDY, Miller Children Trust, Defendants.**

**Bankruptcy Nos. 92 B 18943, 92 B 19473. Adv. No. 92 A 01295.**

United States Bankruptcy Court, N.D. Illinois, E.D.

Nov. 30, 1992.

---

Marvin Berz, Chicago, IL, for debtors.

Howard L. Adelman of Adelman, Gettleman & Merens, Chicago, IL, for plaintiff.

Dennis E. Quaid of Fagel & Haber, Chicago, IL, William E. Jegen, P.C., Glen Ellyn, IL, for defendants.

David Grochocinski, Palos Hills, IL, trustee.

## MEMORANDUM OPINION

JOHN D. SCHWARTZ, Chief Judge.

Galvin Kennedy ("Kennedy") commenced a suit against Barbara Miller ("Barbara") and Laurence Miller ("Laurence") (jointly "Debtors" or "Millers"), which culminated, after over fifteen years of litigation, in the entry of a judgment in his favor for $538,978.44. The judgment was entered on April 23, 1992, by Judge Bonnie Wheaton of the Circuit Court for the 18th Judicial Circuit, DuPage County, Illinois, in accordance with the mandate from the Illinois Appellate Court.[1] The background and the flavor of this fifteen years of litigation is found in the opinion of the Illinois Appellate Court *Kennedy v. Miller*, 221 Ill. App.3d 513, 163 Ill.Dec. 934, 582 N.E.2d 200 (2nd Dist.1991).

A system that permits of this litigation needs to be examined. We in the legal profession are all too familiar with the delay in obtaining a trial court's attention and much has been written concerning this aspect of delay. Perhaps one of the most

---

1. See footnote 17.

noteworthy of the opinions on this subject in this local, was written some forty five years ago. *See, Gray v. Gray,* 6 Ill.App.2d 571, 128 N.E.2d 602 (1st Dist.1955). In *Gray,* the court described the prevalence of this problem:

> The law's delay in many lands and throughout history has been the theme of tragedy and comedy. Hamlet summarized the seven burdens of man and put the law's delay fifth on his list. If the meter of his verse had permitted, he would perhaps have put it first. [*Gray* 6 Ill.App.2d at 578, 128 N.E.2d 602].

Though dealing with trial delay caused by repeated requests for continuances by counsel, its message has meaning for us in the context of this litigation, which incidentally culminated in judgment on The Bard's birth date.[2]

## BACKGROUND

Kennedy won his judgment in accordance with the clear and unequivocal mandate of the Illinois Appellate Court. *Kennedy,* 163 Ill.Dec. at 942, 582 N.E.2d at 208. He immediately proceeded to collect on the judgment. It is that collection process which is before this court. Before examining the steps taken by Kennedy in his collection efforts, it is necessary to first describe the steps employed by the Millers' to thwart Kennedy, and necessarily their other creditors, from ever reaching their assets.[3]

A sequestrator, appointed by the state court, is currently holding $527,700 generated from the sale of the real estate known as the Fox River Farm ("Proceeds"). Kennedy claims ownership of, or alternately, a lien on these Proceeds. It is these Proceeds, as well as Kennedy's claim, which

are the subject of and the source for the settlement agreement between the parties.

Legal title to the Fox River Farm was held by LaGrange State Bank as land trustee under trust agreement dated February 28, 1969, and known as land trust # 982 ("Land Trust # 982"). The Millers acquired this farm about the time of the establishment of Land Trust # 982. The beneficial interest in Land Trust # 982 was originally owned by the Millers, individually. In January of 1978, the Millers formed the Fox River Farms Partnership and on February 28, 1978, assigned their beneficial interest in Land Trust # 982 to this partnership. On May 13, 1990, the Fox River Partnership assigned the beneficial interest in Land Trust # 982 to Barbara, individually.

On August 2, 1990, Barbara, as settlor, and Barbara and Laurence, as trustees, executed a trust agreement known as the Miller Children Trust ("Miller Children Trust"). Under the terms of the Miller Children Trust, Barbara was to receive all of the net income of the Miller Children Trust, at least quarterly, for life. Upon her death, Laurence, if he survived Barbara, would receive the income for his life. Upon Laurence's death, or Barbara's death if Laurence did not survive her, the Miller Children Trust would terminate and all of its assets would be divided equally among the Miller children. On August 2, 1990, Barbara assigned the beneficial interest in Land Trust # 982 to the Miller Children Trust.[4]

It was the foregoing transfers which Kennedy had to unravel if he were to successfully satisfy his judgment against the Millers.

---

2. *See also, Payne v. Pullman Company,* 13 Ill. App.2d 105, 141 N.E.2d 83 (1st Dist.1957).

3. The existence of a fraudulent conveyance has already been determined by the state court, see discussion *infra.*

4. In addition to the beneficial interest in Land Trust # 982, Barbara also transferred the following assets into the Miller Children Trust: ⁵⁄₇ths of the beneficial interest in La Grange State Bank Land Trust # 2500, which holds title to a

parcel of vacant property on Ogden Avenue, in Lyons, Illinois ("Land Trust # 2500); the beneficial interest in LaGrange State Bank Land Trust # 3070 which holds title to the Millers' primary residence ("Land Trust # 3070"); 99.9% of the partnership interest in 700 Ogden Partnership, the primary asset of the partnership is the beneficial interest in a land trust holding title to a building at 700 E. Ogden Avenue, Westmont, Illinois ("700 Ogden").

At the time the judgment was entered in favor of Kennedy and against the Millers, the Millers as trustees of the Miller Children Trust, had executed a contract for the sale of the Fox River Farm.[5] On April 30, 1992, aware that the Fox River Farm might be sold out from under him, Kennedy filed an Emergency Motion in Aid of Enforcement, and among other things, requested the appointment of a sequestrator to receive and hold any monies received on the sale of the Fox River Farm. Judge Wheaton immediately entered a temporary restraining order respecting the transfer of the Fox River Farm or the beneficial interest in Land Trust # 982, and on May 4, 1992, appointed Robert Liston as sequestrator ("Sequestrator").[6]

Kennedy also proceeded with other remedies available under the Illinois Code of Civil Procedure for enforcement of judgments. On April 30, 1990, Kennedy delivered writs of execution to the sheriff. On May 1, 1992, at the first scheduled closing for the sale of the Fox River Farm, the persons in attendance at the closing were served with non-wage garnishment summons under Ill.Rev.Stat. ch. 110, ¶ 12–701: Tom Arthur on behalf of Jane T. Arthur & Associates, Inc., holder of the earnest money on the contract for the sale of the Fox River Farm; BankOne, LaGrange as trustee under Land Trust # 982; Old Second National Bank & Trust Company, individually and as trustee under Land Trust # 5425; and the Chicago Title & Trust which was apparently acting as closing escrowee.

Laurence and Barbara, individually and as trustees under the Miller Children Trust,

were served with non-wage garnishment summons on May 6, 1992. In addition, Kennedy commenced citation to discover asset proceedings under Ill.Rev.Stat. ch. 110 ¶ 2–1402, and on May 6, 1992, served Barbara, individually and as trustee under the Miller Children Trust. On May 10, 1992, Laurence was served with a similar citation, individually and as trustee under the Miller Children Trust.

On May 20, 1992, Judge Wheaton entered an order to continue the hearing on the citation proceedings against BankOne LaGrange, Laurence and Barbara Miller, as trustees under the Miller Children Trust and Barbara, individually, and Kennedy's motion in aid of enforcement, until July 16 and 17, 1992. On May 26, 1992, she also continued the citation proceedings against Laurence until July 16, 1992.[7]

On July 16 and 17, 1992, a hearing was held before Judge Wheaton on Kennedy's motion for aid in enforcement of judgment,[8] and on August 10, 1992, she issued a written opinion and order holding that the transfers of the beneficial interest in Land Trust # 982 by the Fox River Partnership to Barbara and by Barbara to the Miller Children Trust were fraudulent transfers under the Uniform Fraudulent Transfer Act ("UFTA"). Ill.Rev.Stat. ch. 59, § 101 *et seq.*[9] ("Memorandum Opinion").

In the Memorandum Opinion, Judge Wheaton also noted that one of the Miller children, Julia, had questioned whether the Miller children were necessary parties to the post-judgment proceedings. The court

---

5. In order to facilitate the sale of the Fox River Farm, another Illinois land trust was established at Old Second National Bank of Aurora pursuant to a land trust agreement dated April 17, 1992 and known as trust # 5425 ("Land Trust # 5425").

6. The May 4, 1992 order also continued the hearing on the Emergency Motion in Aid of Enforcement until May 20, 1992 and noted that "any person claiming a *present* interest in the Miller Children Trust may be made parties by service of a non-wage garnishment or a Citation to Discover assets." (Emphasis added).

7. The order also referenced citation proceedings against Julia Miller and Arlington Securities.

Kennedy's counsel has not indicated or produced evidence of commencement of citation proceedings against Julia Miller or Arlington Securities or whether service of a citation to discover assets, was had upon them.

8. Attorney *Thomas A. Davis III* ("Davis") filed an appearance on behalf of Julia Miller–McDonnell ("Julia"), one of the Miller children, during this hearing.

9. Judge Wheaton also determined that the transfer of the other assets described in note 4 were fraudulent conveyances.

held that the issue was rendered moot when Davis, on behalf of Julia, voluntarily appeared at the July 17, 1992 hearing. Memorandum Opinion at p. 9. The court referred to Julia as guardian *ad litem* of the minor Miller children, but, no order appointing her as such has been provided to this court.

In the meantime, on July 29, 1992, the sale of the Fox River Farm had closed. After paying expenses related to the sale, the net proceeds of $531,409.41 were held by the escrowee and invested in treasury bills on behalf of the Sequestrator.[10] Thereafter the Sequestrator filed his First Report and Account.

On August 18, 1992, in response to the Sequestrator's First Report, Judge Wheaton entered an order authorizing the Sequestrator to liquidate the investments and hold the proceeds to pay all fees and distribute the balance to Kennedy in partial satisfaction of his judgment. At the request of the Millers, the court stayed this order until August 25, 1992.

On August 19, 1992, the Millers filed a motion to set an appeal bond and to stay distribution of the Proceeds for twenty-one days.

On August 21, 1992, Davis filed a motion seeking payment of certain professional expenses of Julia, et al, from the Proceeds and an emergency motion requesting a stay in the turnover of the Proceeds to Kennedy for twenty-one days. The motions were noticed for hearing on August 24, 1992, at which date Judge Wheaton put all motions over for hearing to August 25, 1992.

At the hearing on August 25, 1992, Judge Wheaton was informed that Laurence had commenced an individual proceeding under Chapter 11 of the Bankruptcy Code on the previous day. Barbara had

not filed and, Judge Wheaton authorized the Sequestrator to disburse the funds after finding:

[A]s a matter of law that [sic] the order of August 10, 1992 holding certain transfers to be fraudulent as to Galvin Kennedy does not revest title in the transferred assets in the transferor but merely attaches the lien of judgment to those assets in the hands of the trustees of the Miller Children Trust and subjects those assets to judicial sale to satisfy the judgment of this Court.

Judge Wheaton denied the request to stay distribution for twenty-one days, but, did stay enforcement of the order for 48 hours to allow application to the Bankruptcy Court.[11] Chicago Title & Trust issued a draft payable to Kennedy and his attorney in the amount of $527,690.86. The check was not delivered.

As said, Laurence filed a petition for relief under Chapter 11 of the Bankruptcy Code on August 24, 1992, the day before the check in the amount of $527,690.86, was to be caused to be delivered by the Sequestrator, to Kennedy, in partial satisfaction of his judgment. On August 26, 1992, Kennedy filed a motion "For A Determination That The Automatic Stay Is Inapplicable To The Proceeds Of Fox River Farms or Alternatively For Relief From Section 362 As To Said Assets." (All section references are to the Bankruptcy Code, 11 U.S.C. § 101 et seq., and shall hereinafter be referred to as § —— of the Bankruptcy Code). The Federal Deposit Insurance Corporation ("FDIC"), another creditor of the Millers, filed an adversary complaint on August 31, 1992, seeking an injunction under § 105 of the Bankruptcy Code, to enjoin the enforcement of Kennedy's judgment and the distribution of the Proceeds.[12] A temporary injunction was

---

**10.** An escrow account had been established at Chicago Title & Trust Company on July 28, 1992.

**11.** The court also found that Julia waived "any objection to service, or lack thereof upon her or the—her two minor brothers of whom she is appointed guardian ad litem" by voluntarily appearing before the court. Transcript of August 25, 1992 hearing at p. 13.

**12.** The petitions filed by each of the Debtors indicated that the FDIC claims an amount of $20 million from the Debtors. That claim arises from litigation currently pending in the United States District Court for the Northern District of Illinois in *FDIC v. Laurence B. Miller et al.,* 90 C 5515. The FDIC brought that action against the Millers alleging breach of fiduciary duties, gross negligence and other fraudulent acts in connec-

entered by this court on August 31, 1992, enjoining any action to enforce the judgment against the Millers and specifically prohibiting any disbursement of the Proceeds.

On August 31, 1992, about the time of the hearing, Barbara commenced her individual proceedings for relief under Chapter 11 of the Bankruptcy Code.[13]

The court concluded that the appointment of a trustee might well be necessary and requested the United States Trustee to consider the advisability of such appointment.[14] The United States Trustee appointed David Grochocinski as trustee of both estates ("Trustee") and this court concurred.

On September 24, 1992, the Trustee filed a complaint against Kennedy and the Miller Children Trust, Adversary No. 92 A 1295, to "Determine the Validity, Priority or Extent of Liens or Other Interest in Property of the Estates, and to Avoid Preferential Transfers, Pursuant to Section 547 of the Code" ("Complaint").

Kennedy requested that a hearing on his motion for relief from the stay be held within the time parameters of § 362(e) of the Bankruptcy Code. The hearing commenced on September 25, 1992. At the conclusion of the hearing this court denied Kennedy's motion for relief from the stay after finding that there was "a reasonable likelihood" that the Trustee could prevail at a final hearing. The final hearing was set for October 26, 1992.

On October 2, 1992, the Trustee filed a complaint against the Sequestrator, Adversary No. 92 A 1329, seeking a turnover of the Proceeds ("Turnover Complaint"). On this same date the Trustee also filed a "Motion for the Entry of an Order Authorizing the Limited Use of Cash Collateral" ("Cash Collateral Motion"). By that motion the Trustee requested limited use of the Proceeds as cash collateral to manage the Debtors' estates. On October 15, 1992, Kennedy filed objections to the Cash Collateral Motion.

The parties suggested to the court that it hold a settlement conference and one was held prior to the final hearing on Kennedy's motion. The Trustee reached a settlement with Kennedy that he felt he could propose to the creditors of these estates. The settlement agreement, approved by the court on November 23, 1992, provides that Kennedy's claim shall be an allowed secured claim in the amount of $385,000, with the balance of his claim allowed as an unsecured claim ("Settlement Agreement").[15] The remaining Proceeds will be retained by the Trustee free and clear of all liens, claims and encumbrances. In addition, the Settlement Agreement provides that Kennedy reserves all rights to; seek subordination of any other claims against the estates; seek a determination that his unsecured claim is nondischargeable; enforce any cause of action against anyone not a party to the Settlement Agreement; and/or seek a dismissal of the Millers' cases. Following entry of an order approving the Settlement Agreement and pay-

---

tion with the Millers' previous positions with Lyons Federal Trust & Savings ("Lyons"). Laurence was Chairman of the Board of Directors and Chief Executive Officer of Lyons and Barbara was President of Lyons.

**13.** By order of this court, the two cases have been procedurally, but not substantively consolidated.

**14.** The Millers are trustees of the Miller Children Trust and income beneficiaries (see p. 512 of this Opinion). The conflict between the Millers as trustees under the Miller Children Trust and as trustees under the Bankruptcy Code's § 1107, as debtors-in-possession, is apparent to the naked eye. The Millers as debtors-in-possession would not be in a position to challenge the

legality of the property transfers to the Millers as trustees of the Miller Children Trust. The Debtors' prior counsel apparently understood this conflict as he offered no objection to the appointment of the Trustee. Present counsel has questioned the need for the Trustee.

**15.** The Settlement Agreement is between the Trustee, Kennedy, William E. Jegen P.C. and William E. Jegen ("Jegen"). Jegen represented Kennedy in the state court proceedings against the Millers and in the proceedings before this court. Pursuant to a written fee agreement between Jegen and Kennedy, Jegen claims an attorney's lien of 40% of the Proceeds collected by Kennedy, plus costs advanced in excess of $21,000.

ment of the Proceeds to Kennedy and the Trustee, the Trustee will dismiss the Complaint against Kennedy and the Turnover Complaint against the Sequestrator, with prejudice and withdraw the Cash Collateral Motion, Kennedy in turn, will dismiss his motion, with prejudice.

At the hearing on November 23, 1992, the Trustee testified that he believed the Settlement Agreement was in the best interests of the estates. The Trustee's attorney, Howard L. Adelman ("Adelman") testified regarding the factors he considered in evaluating the Settlement Agreement. Mr. Adelman noted that there were six theories upon which Kennedy could have succeeded, with several of those theories disputed in the federal and state courts (as more fully discussed herein). Mr. Adelman also recognized that based upon the litigation history between the Millers and Kennedy, that Kennedy would pursue appeals to the fullest extent. In his final analysis, Mr. Adelman concluded that the Trustee's likelihood for success was slim, that the estates would have been required to expend approximately $250,000 in litigation costs and the final result would have been that the estates and its creditors would not recover any of the Proceeds.

The FDIC, as a creditor of both estates, and McKenna, Storer, Rowe, White & Farrug, a creditor of only Laurence, each appeared in open court and gave their respective approval to the Settlement Agreement.

The Debtors filed objections to the Settlement Agreement. The Debtors' principal objection concerned two appeals pending in the Illinois Appellate Court; (a) the amount of the judgment for Kennedy, and (b) Judge Wheaton's determination that the transfers to the Miller Children Trust were a fraudulent conveyance under Illinois law. Adelman testified that he believed there was little merit to the appeals.

Laurence was called as a witness and questioned on the schedules filed in his

bankruptcy case, which listed the Fox River Farm Partnership, 700 Ogden, Land Trust # 2500 and Land Trust # 3070 as personal property, with a footnote on the schedule indicating that those properties had been conveyed to the Miller Children Trust on August 2, 1990. Laurence's response to this line of questioning was inconsistent, he testified that he claims an interest in the property transferred to the Miller Children Trust, but then testified that his intent was to convey all of his interest in those properties to Barbara and have those assets taken out of his personal estate. Barbara, an attorney licensed to practice in Illinois, also testified to this same effect. In addition, Barbara testified that she had filed the two appeals to the Illinois Appellate Court. No authority was obtained from this court for this action.[16]

## DISCUSSION

■ Bankruptcy Rule 9019(a) authorizes this court to approve a compromise or settlement agreement. Fed.R.Bankr.P. 9019(a). The rule provides:

On motion by the trustee and after a hearing on notice to creditors, the United States trustee the debtor and indenture trustees as provided in Rule 2002 and to such other entities as the court may designate, the court may approve a compromise or settlement.

A bankruptcy court should approve a settlement only if it is in the best interests of the estate. *In re American Reserve Corp.*, 841 F.2d 159, 161 (7th Cir.1987); *In re Energy Cooperative Inc.*, 886 F.2d 921, 927 (7th Cir.1989); *In re Central Ice Cream Co.*, 59 B.R. 476, 487 (Bankr. N.D.Ill.1985). This determination requires "a comparison of the settlement's terms with the litigation's probable costs and probable benefits." *American Reserve*, 841 F.2d at 161. In making this comparison the bankruptcy judge should consider "the litigation's probable costs and probability of success, the litigation's complexity,

---

**16.** The facts set forth in this Opinion are taken in large part from the memoranda submitted by the parties, the hearing held under § 362(e) of the Bankruptcy Code on September 25, 1992 and the hearing held under Fed.R.Bankr.P.

9019(a) on November 23, 1992 and are uncontested. This Memorandum Opinion shall constitute additional findings of fact and conclusions of law to the order entered November 23, 1992.

and the litigation's attendant expense, inconvenience, and delay." *Id.*

In *Central Ice Cream* the bankruptcy court approved the settlement of the estate's claim against McDonalds Corporation for $15.5 million. The estate had won a favorable verdict against McDonalds for $52 million in protracted state court litigation. In post trial motions, McDonalds requested a judgment notwithstanding the verdict, a new trial and/or remittitur of the damages. Faced with the uncertainty on the outcome of the post trial motions, the likelihood of further appeal and the possibility of having to start from square one if a new trial was granted, the court concluded that the settlement was in the best interests of the estate. Although the settlement amount represented only approximately 30% of the verdict, the bankruptcy court determined that that was a reasonable amount to eliminate the "risks and delays of litigation." *Central Ice Cream*, 59 B.R. at 488.

■ The trustee's right to settle is not, however, limited to pending suits, but "extends to all controversies affecting the estate." *In re Del Grosso*, 106 B.R. 165, 167 (Bankr.N.D.Ill.1989), *rev'd on other grounds*, 129 B.R. 156 (N.D.Ill.1991). Unlike *Central Ice Cream*, this case does not involve the settlement of a claim by the estate against a third party. Nor is it necessary for this court to determine the value of Kennedy's claim. Kennedy's claim against the Debtors has been fully litigated and the Debtors have no meaningful grounds for appeal.[17] This court is bound by principles of full faith and credit, as well as comity and res judicata to recognize the state court judgment and Kennedy's claim against the estate in the amount of $538,978.

What this settlement involves is the status afforded Kennedy's claim within the estate. Is it to be treated as a secured or unsecured claim? What is the relative priority between Kennedy's claim and the claims of other creditors? These rights of priority and avoidance belong not to the Debtors individually, but to the estates and their respective creditors.

This court has noted throughout the proceedings that this case involves a number of very complicated issues, and each issue it seems, is riddled with uncertainty at both the federal and state levels. Furthermore, it was apparent from the positions of the parties and the authorities supporting each of their arguments, that this matter would not be finally settled until it reached the Seventh Circuit Court of Appeals or beyond.

To establish the degree of the complexity of this litigation, the risks involved, and the attendant expense in further appealing Kennedy's claim through the federal courts, this court will discuss the issues raised by Kennedy in support of his claim, and the relevant authorities on each issue.

■ In his motion, Kennedy first sought a determination that the Proceeds were not property of either Barbara's or Laurence's bankruptcy estate. Property of the estate is broadly defined to include "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). While federal law determines what constitutes property of the estate, state law determines the debtor's interest in specific property. *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1343 (7th Cir. 1987).

---

**17.** The Illinois Appellate Court "reverse[d] that part of the trial court's decision that found Kennedy was not entitled to any profits and remand[ed] with directions to enter judgment for Kennedy." *Kennedy*, 163 Ill.Dec. at 936, 582 N.E.2d at 202. The Appellate Court indicated that it would have entered judgment in favor of Kennedy as authorized by Supreme Court Rule 366, but for the fact that the applicable interest rates for the last quarter of 1989, and 1990 and 1991 were not in the record. Accordingly, the court remanded the matter to the trial court with specific instructions that it enter judgment in favor of Kennedy in the amount of $399,-347.80 plus the additional interest at the prevailing average prime rate for 1989, 1990 and 1991. *Kennedy*, 163 Ill.Dec. at 941, 942, 582 N.E.2d at 207, 208. The Illinois Supreme Court denied the appeal from that decision. *Kennedy v. Miller*, 144 Ill.2d 634, 169 Ill.Dec. 143, 591 N.E.2d 23 (1992).

The complexity in applying this definition to the facts of this case is apparent when we ask, who owned the beneficial interest in Land Trust # 982 as of the commencement of each of the cases in question. As of the commencement of each case, the beneficial interest in Land Trust # 982 had been transferred to the purchaser and the purchaser's land trust and it is the Proceeds from the sale of the res of Land Trust # 982, held in an escrow account under the control of a Sequestrator, with which we are concerned. However, on August 10, 1992, Judge Wheaton held that the transfers of the beneficial interest in Land Trust # 982, from Laurence to Barbara, and from Barbara to the Miller Children Trust, were fraudulent conveyances under the Illinois Uniform Fraudulent Transfer Act.

Courts have generally held that § 541 includes "property fraudulently or improperly transferred by the debtor before bankruptcy." *Koch Refining*, 831 F.2d at 1343; *In re MortgageAmerica Corp.*, 714 F.2d 1266 (5th Cir.1983). Neither *Koch Refining* or *MortgageAmerica*, however, considered what interest, under Illinois law, the judgment debtor has in property fraudulently conveyed. The Seventh Circuit, in reaching the conclusion that fraudulently conveyed property is property of the estate, did not analyze Illinois law to determine the nature of the debtor's interest in such property, but, merely cited *MortgageAmerica* with approval. *MortgageAmerica* was decided under Texas law.[18]

Bankruptcy courts are instructed to determine the debtor's interest in property under state law. Under Illinois law a fraudulent conveyance is "valid and binding and no interest, legal or equitable, remains in the grantor...." *DeMartini v. DeMartini*, 385 Ill. 128, 133, 52 N.E.2d 138 (1943). In *DeMartini* the Illinois Supreme

Court held that "a transfer of property fraudulent and void as to creditors is nevertheless valid as between the parties thereto. (Citations omitted). A conveyance of this sort is void only as against creditors, and then only to the extent to which it may be necessary to deal with the conveyed estate for their satisfaction." *Id.* 385 Ill. at 134, 52 N.E.2d 138. The court further explained:

> The decree of the circuit court which set aside this conveyance at the suit of the plaintiff did not invalidate the conveyance as to them, but only as to the plaintiff.... *The property did not thereby again become that of the [judgment debtor], but was merely made subject to be applied to the payment of plaintiff's judgment to the same extent as it might have been had it remained the property of the judgment debtor. [DeMartini* 385 Ill. at 135, 52 N.E.2d 138, emphasis added].

*DeMartini*, clearly states that an order setting aside a fraudulent conveyance does not revest title in the grantor and the grantor has no interest in the property legal or equitable. If the debtor has no interest in the property under state law, then, is there any part of the Proceeds or anything which can be included in either bankruptcy estate? This indicates a possible conflict between the holding of the Seventh Circuit in *Koch Refining* and Illinois law. This conflict may be able to be reconciled by considering the theory for including fraudulently conveyed property in the bankruptcy estate; although a fraudulent transfer passes title to the transferee, the fact that the property fraudulently conveyed can be subject to the claims of the judgment debtor's creditors indicates that the judgment debtor must have some inter-

---

**18.** In *MortgageAmerica* the Fifth Circuit recognized that under the Texas Fraudulent Transfer Act, Tex.Bus. & Com.Code Ann. §§ 24.02–.03 (Vernon 1968), the fraudulent transfer may pass good title to a transferee without notice. *MortgageAmerica*, 714 F.2d at 1272. The court reasoned that although "[t]he transferee may have colorable title to the property, [ ] the equitable interest—at least as far as the creditors (but not the debtor) are concerned—is considered to remain in the debtor so that creditors may attach or execute judgment upon it as though the debtor had never transferred it." *Id.* at 1275. Accordingly, the Fifth Circuit concluded that property fraudulently conveyed "remains, despite the purported transfer, property of the estate." *MortgageAmerica*, 714 F.2d at 1277.

est in the property. It is this interest that is included in the bankruptcy estate.

Or the more simple solution to this conflict may lie in the trustee's avoiding powers. The Trustee, with his avoiding power under § 544, would have the same ability to set aside the transfers that Kennedy did. As the Supreme Court stated in *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983) "§ 541(a)(1) is intended to include in the estate any property made available to the estate by other provisions of the Bankruptcy Code."

The Trustee also had means of reaching the Proceeds and the beneficial interest in Land Trust # 982, via the Debtors' interest in the Miller Children Trust. Kennedy attempted to circumvent this method of reaching the Proceeds by characterizing the Miller Children Trust as a spendthrift trust.

■ Under § 541(c)(2) of the Bankruptcy Code a valid spendthrift trust under Illinois law would not be included in the bankruptcy estate.[19] *See, In re Goldberg,* 98 B.R. 353, 356 (Bankr.N.D.Ill.1989). Although Illinois courts recognize spendthrift trusts, they have never, to this court's knowledge, permitted a settlor to avoid the payment of the settlor's creditors by the creation of a spendthrift trust for the settlor's own benefit. *Crane v. Illinois Merchants Trust Company,* 238 Ill.App. 257, 262 (1st Dist. 1925); *In re Lyons,* 118 B.R. 634, 640 (C.D.Ill.1990), *aff'd,* 957 F.2d 444 (7th Cir. 1992); *In re Balay,* 113 B.R. 429, 437 (Bankr.N.D.Ill.1990). Such an attempt by the settlor to prevent her creditors from reaching the trust res will be ineffective. *In re Morris,* 144 B.R. 401, 404 (Bankr. C.D.Ill.1992).

■ Barbara, it will be recalled, was originally an individual owner of the beneficial interest in Land Trust # 982 with her husband Laurence, and then a partner with her husband in the partnership holding this interest, prior to its transfer to her as the sole owner and then of course her transfer to the Miller Children Trust. Barbara's and Laurence's attempt to place their assets beyond the reach of creditors can not withstand attack. Laurence was not a settlor, but, the rule that a settlor can not create a spendthrift trust for her own benefit, applies equally to "indirect settlors" who procure the creation of the trust for their benefit. 2A *Bogert, Trusts & Trustees* § 223, at 447 (2d ed. 1979). The Miller Children Trust should not be confused with an ERISA qualified pension plan, which is exempted from a bankruptcy estate under § 541(c)(2) of the Bankruptcy Code. *See, Patterson v. Shumate,* — U.S. —, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992).

The economic reality of this transaction is that Laurence, as husband, would enjoy the income produced by the Miller Children Trust during Barbara's life. Upon Barbara's death, Laurence, if he survived her, would receive the income for his life. Under this factual situation Laurence was clearly an "indirect settlor". Therefore, both Laurence's and Barbara's interest in the Miller Children Trust would be considered property of the estate.

The above analysis indicates that the Trustee without question would have succeeded in reaching the Proceeds. However Kennedy's first argument can not be isolated, but, must be considered along with his alternative claim that he had a perfected judicial lien in the Proceeds, as well as the beneficial interest of Land Trust # 982, which existed over ninety days before the commencement of these two cases. Much of the complexity of this case and the final outcome stems from this argument. Both arguments would have been raised at each stage of all appeals, thus requiring additional time commitments by the Trustee and his attorneys and thereby contributing to the expense of these appeals.

Kennedy alternately asked this court to lift the automatic stay of § 362 of the Bankruptcy Code to allow distribution of the Proceeds held by the Sequestrator, in

19. Section 541(c)(2) of the Bankruptcy Code provides that a "restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title."

accordance with the Judge Wheaton's August 25, 1992 order. In support of his argument for lifting the stay, Kennedy claimed that he had a perfected judgment lien on the Proceeds and the beneficial interest in Land Trust # 982, over ninety days old. That argument raised several complicated issues concerning obtaining a lien on intangible personal property, obtaining a lien on fraudulently conveyed property, when such a lien attaches, and whether it was a preferential transfer under the Bankruptcy Code. The court will address each issue in turn.

■ A lien on tangible personal property is obtained by delivering a certified copy of the judgment to the sheriff. Ill.Rev.Stat. ch. 110, ¶ 12–111.[20] The beneficial interest in a land trust is intangible personal property. *Kaiser–Ducett Corp. v. Chicago–Joliet Livestock Marketing Center, Inc.*, 86 Ill.App.3d 216, 41 Ill.Dec. 651, 407 N.E.2d 1149 (3d Dist.1980). There is a great deal of confusion in both the Illinois and Federal courts on the proper method for obtaining a lien on intangible personal property and when that lien attaches.

There are three different views on how a creditor obtains a lien on intangible personal property and when that lien attaches. The first view is that the writ of execution is used to obtain the lien and therefore the lien attaches upon delivery of the writ to the sheriff.[21] *Asher v. United States*, 436 F.Supp. 22 (N.D.Ill.1976), *aff'd*, 570 F.2d 682 (7th Cir.1978); [22] *Kaiser–Ducett* 86 Ill. App.3d at 219, 41 Ill.Dec. 651, 407 N.E.2d 1149. Under this view a citation to discover assets proceeding is merely used to enforce the lien against the judgment debtor. *Kaiser Ducett* 86 Ill.App.3d at 219, 41 Ill. Dec. 651, 407 N.E.2d 1149.

In determining that the writ of execution created a lien on intangible personal property, the District Court in *Asher* relied on

*Levine v. Pascal*, 94 Ill.App.2d 43, 236 N.E.2d 425 (1st Dist.1968). *Levine* involved a priority dispute between a judgment lien creditor and a holder of an unperfected security interest, over a beneficial interest in a land trust. The secured creditor challenged the lien creditor's status and accordingly the court was required to determine when the lien attached. The court held:

Clearly, plaintiff became a lien creditor as defined in section 9–301(3) of the Commercial Code when the writ of execution was placed in the hands of the sheriff. [Citations omitted]. While it may be doubtful whether the plaintiff could effectively enforce his lien by means of the writ of execution, there is no doubt that he could do so through citation proceedings. [*Levine*, 94 Ill.App.2d at 55, 236 N.E.2d 425].

This language in *Levine* has been the source of the much of the confusion over whether a writ of execution or service of a citation to discover assets creates a lien on intangible personal property.

The second view, and the view followed by this court, holds that a lien is created upon issuance and service of the citation to discover assets. *In re Gus Hormovitis and George Karahalios*, 57 B.R. 471, 475 (Bankr.N.D.Ill.1985) (Schwartz, J.); *In re Waner*, 89 B.R. 751, 755 (Bankr.N.D.Ill. 1988) (Schmetterer, J.); *In re Einoder*, 55 B.R. 319, 324 (Bankr.N.D.Ill.1985) (Ginsberg, J.); *In the Matter of Stoner Invs., Inc.*, 7 B.R. 240 (Bankr.N.D.Ill.1980) (Eisen, J.); *Mid–West Nat. Bank v. Metcoff*, 23 Ill.App.3d 607, 319 N.E.2d 336 (2nd Dist. 1974); *Bank of Broadway v. Goldblatt*, 103 Ill.App.2d 243, 243 N.E.2d 501 (1st Dist.1968). This view was consistently followed by the bankruptcy courts in this district until Judge Barliant held in *In re Jaffe*, 111 B.R. 701, 709 (Bankr.N.D.Ill.

---

**20.** Illinois Revised Statutes ch. 110, ¶ 2–1501 provides that this section replaces the "writ of execution". Because the Illinois cases discussed in this opinion use the term "writ of execution" that term will be used to avoid confusion.

**21.** Kennedy delivered a writ of execution to the sheriff on April 30, 1992.

**22.** In affirming the district court, the Seventh Circuit stated in dicta: "It is also undisputed that a lien is created upon tangible personal property by delivery of a writ of execution, *id.* § 9, and *upon intangible personal property by instituting a proceeding to discover assets....*" *Asher*, 570 F.2d at 683, (emphasis added).

1990), that the initiation and service of a citation to discover assets, alone, does not create a lien on intangible personal property.

In *Jaffe*, Judge Barliant noted that the Illinois statute governing supplementary proceedings, Ill.Rev.Stat. ch. 110 ¶ 2–1402, "does not expressly create a lien upon the issuance of a citation, but provides that once assets are found, the court may then enter an appropriate order or judgment to apply the discovered assets to satisfy the judgment." *Jaffe*, 111 B.R. at 703. On the other hand, Judge Barliant noted that other Illinois statutes governing enforcement of judgments, expressly provide for the creation of liens as follows: "Ill.Rev.Stat. ch. 110 ¶ 12–707(a) (1987) (lien created when the garnishee is served with garnishment summons); Ill.Rev.Stat. ch. 110 ¶ 4–126 (1987) (lien created upon the service of an order of attachment); Ill.Rev.Stat. ch. 110 ¶ 12–101 (1987) (lien on real estate created when a transcript, certified copy or memorandum of judgment is filed in recorder's office); Ill.Rev.Stat. ch. 110 ¶ 12–808(b) (1987) (lien on wages created when employer served with wage deduction summons)." *Id.* at 704.

Based upon the omission of express language in the statute creating a lien and the lack of any clear authority from the Illinois Supreme Court or the Seventh Circuit, Judge Barliant concluded that "initiation and service of a citation to discover assets did not create a lien or other property interest...." *Jaffe* 111 B.R. at 709. This view has subsequently been adopted by Magistrate Judge Bobrick of the United States District Court, Northern District of Illinois in *Water Technologies Corporation v. Calco, Ltd.*, 132 F.R.D. 670 (N.D.Ill. 1990).

Both *Jaffe* and *Water Technologies* based their conclusion on the premise that there is no clear direction from the Seventh Circuit or Illinois Supreme Court on this issue. However the Seventh Circuit clearly stated in *Asher*, albeit in dicta, that a lien on intangible personal property is created "by *instituting* a proceeding to discover assets." *Asher* 570 F.2d at 683. This decision is further supported by *King v. Ionization International, Inc.*, 825 F.2d 1180 (7th Cir.1987).

*King* involved a priority dispute over a judgment debtor's patent license. The Seventh Circuit noted that Illinois lien law is in "utter confusion", but, stated that "[a] citation proceeding is apparently the only way to levy judgment in Illinois against a judgment debtor's intangible assets, such as a patent license." *King* 825 F.2d at 1187, 1188. One of the issues to be decided in *King* was whether a lien lapsed when the citation proceeding terminated.[23] The court concluded that the lien did not lapse. *King* 825 F.2d at 1188. In deciding that the lien did not lapse, the court necessarily had to presume that the lien attached upon initiation and service of the citation to discover assets.

As the above discussion indicates there is case law supporting each of the three positions. When a lien attaches in a citation to discover asset proceeding, may not, however, have been the determinative issue or possibly even the proper method for obtaining a lien on intangible property that has been fraudulently conveyed. Unlike the cases discussed above, the judgment debtors in this case had fraudulently conveyed away the beneficial interest in the land trust prior to commencement of citation proceedings. Kennedy, aware of this fact, did not rely solely on the citation proceedings, he also commenced garnishment proceedings against the Millers, individually and as trustees of the Miller Children Trust, and against the land trustee of Land Trust # 982, and had the Sequestrator appointed to take control of the Proceeds. Which raises perhaps the most complicated, yet important issue: How does a judgment creditor obtain a lien on fraudulently conveyed property and when does such a lien attach?

Kennedy argued that *Hallorn v. Trum*, 125 Ill. 247, 17 N.E. 823 (Ill.1888) and *Crane*, 238 Ill.App. 257, provided the an-

---

**23.** The court noted that citation proceedings terminates within six months if collection is not accomplished, unless extended. *King*, 825 F.2d at 1188.

swer to this question. According to Kennedy's interpretation of *Hallorn*, the lien attaches when all parties are before the court, on either service of citations to discover assets or non-wage garnishment summons. Because all parties claiming a present interest in the Proceeds were served by May 10, 1992, Kennedy contended that his lien attached no later than May 10, 1992.

■ *Hallorn* provides the clearest answer on how a lien is obtained on fraudulently conveyed property and when that lien attaches. *Hallorn* involved a dispute between two judgment creditors, to real property fraudulently conveyed by the judgment debtor. Creditor one obtained a judgment on June 22, 1867, and filed a creditor's bill on July 24, 1867, alleging that the conveyance was fraudulent and asking that the deed be set aside. Creditor two obtained a judgment on October 8, 1867, and filed a creditor's bill on September 8, 1867, to have the deed set aside. Initially the court noted that neither creditor obtained a lien on the property by entry of the judgment as the fraudulent conveyance was effective to pass title.[24] Instead the court said: "In order, therefore, to determine the priority of liens between the two contesting creditors, we must look to the proceedings in equity instituted by them to remove the fraudulent conveyance, and subject the lands to the satisfaction of their judgments." *Hallorn*, 125 Ill. at 252, 17 N.E. 823.

To determine which lien had priority the court held that "a creditor's bill, with proper and distinct averments as to the property attempted to be reached, will become a lien upon the filing of the bill, and service of subpoena upon those who are proper parties defendant." *Hallorn* 125 Ill. at 253, 17 N.E. 823. Because creditor two was the first to obtain service upon all parties, including the transferee, the court

determined that creditor two had the first lien on the property.

*Hallorn* seems to provide a simple answer to the question posed above: How does a judgment creditor obtain a lien on fraudulently conveyed property and when does such a lien attach? But, as this court has previously noted, there are no simple answers to the issues raised in this case. The problem is that a creditor's bill no longer exists in Illinois, and when repealed by the Illinois legislature nothing was introduced in its place.

Kennedy argued that a garnishment proceeding replaced the former creditor's bill. Relying on this he served non-wage garnishment summons on the Millers, individually and as trustees of the Miller Children Trust. Whether Kennedy was correct in his assertion is also unclear under Illinois law. In *Citizens National Bank v. Grossman*, 21 Ill.App.2d 573, 574, 159 N.E.2d 22 (1st Dist.1959), the court stated that beneficial interests "are not proper subjects of garnishment." On the other hand, in *Fidelity Coal Company v. Diamond*, 322 Ill.App. 229, 240, 54 N.E.2d 240 (1st Dist. 1944) the court analogized a creditor's bill to a garnishment suit. The court said that both are instituted for the same purpose, as a means for a judgment creditor to reach money held by a third party which is owed to the judgment debtor.

*Crane*, 238 Ill.App. 257, lends additional support to Kennedy's argument. *Crane* dealt specifically with fraudulently conveyed property and seems to have carved out an exception to allow garnishment of beneficial interests, where such property has been fraudulently conveyed into a trust.

In *Crane* a judgment creditor brought a garnishment proceeding against a Trust Company. The Trust Company responded to interrogatories that it held no property of the judgment debtor other than property

---

**24.** This is one rule that seems to be well settled in Illinois. *See, DeMartini*, 385 Ill. at 133, 52 N.E.2d 138, where the Illinois Supreme Court again explained: "[J]udgment creditors have no lien, by virtue of their judgment alone, upon lands fraudulently conveyed by the debtor prior to the rendition of their judgments, and no

importance is to be attached to the fact that one was rendered prior to the rendition of the other. The legal title having passed from the judgment debtor before the rendition of either judgment, the judgments do not become liens on the land conveyed in the order of their rendition."

it held as trustee under two trust agreements. The court noted that the trusts were allegedly spendthrift trusts, but that a person can not create a spendthrift trust for his own benefit. The court therefore concluded that the conveyance into trust was fraudulent.

The garnishee defendant argued that garnishment was not a proper procedure to reach the trust property because a fraudulent conveyance is valid between the parties to it, and the judgment debtor could not sue to recover the property[25]; that the judgment creditor could not use garnishment to recover the property. The court rejected this argument stating:

> The general rule that a judgment creditor in a proceeding by garnishment acquires no greater rights against the garnishee than the judgment debtor has, and therefore can only recover such indebtedness as could be recovered by the debtor in an action of debt, or *indebitatus* assumpsit, against the garnishee (*Webster v. Steele*, 75 Ill. 544), is subject to an exception in cases of fraud affecting the rights of judgment creditors (Drake on Attachment, sec. 456; *Commercial Nat. Bank v. Kirkwood*, 172 Ill. 563, 567 [50 N.E. 219 (1898)]; *Humphreys v. Atlantic Milling Co.*, 98 Mo. 542, 549 [10 S.W. 140 (1888)]; *First Nat. Bank v. Knowles*, 67 Wis. 373, 390 [28 N.W. 225 (1886)]), and in cases where money or personal property of a debtor has been transferred by him for the purpose of defrauding creditors, the transferee may be held liable in a garnishment proceeding for the money or property so conveyed or its proceeds. (Drake on Attachment, sec. 458; *Stevens v. Dillman*, 86 Ill. 233; *Henry v. Murphy & Co.*, 54 Ala. 246, 256; *Cohn v. Malo*, 198 Ill.App. 538, 545; 27 Corpus Juris p. 708, sec. 549.) [*Crane* 238 Ill.App. at 268].

Based upon *Hallorn*, 125 Ill. 247, 17 N.E. 823 and *Crane*, 238 Ill.App. 257, Kennedy may have acquired a lien on the assets of the Miller Children Trust when all parties were before the state court pursuant to non-wage garnishment summons. *Assuming arguendo*, that this court accepted that argument, there is a question whether Kennedy complied with the requirements that he so vigorously argues for. That is, had Kennedy brought all necessary parties before the state court by May 10, 1992, as he contends. He succeeded in doing so only if the future beneficiaries of the Miller Children Trust, the Miller children, were not necessary parties.

█ Illinois courts follow the general rule that the beneficiaries are necessary parties to any action "by or against a trustee relating to the trust or its property". *Anderson v. Elliott*, 1 Ill.App.2d 448, 453, 117 N.E.2d 876 (1st Dist.1954). There is an exception to this general rule where the trustee properly represents the beneficiaries' interests. For instance, when "the litigation does not concern the rights of the trustee and the *cestuis*, as between themselves, in any way, the *cestuis* are not necessary parties." *Id.* at 454, 117 N.E.2d 876.

An action to set aside a fraudulent conveyance into trust appears to fall within that exception. In 1888, the Supreme Court determined that the trust beneficiaries were not necessary parties to an action by an assignee in bankruptcy, to set aside a fraudulent conveyance of property into the trust. *Vetterlein v. Barns*, 124 U.S. 169, 8 S.Ct. 441, 31 L.Ed. 400 (1888). The court noted that generally the beneficiaries and the trustee must be made parties to an action relating to the trust. "But where the complainant claims in opposition to the assignment or deed of trust, and seeks to set aside the same on the ground that it is fraudulent and void, he is at liberty to proceed against the fraudulent assignee or trustee, who is the holder of the legal estate in the property, without joining the *cestui que trust.*" *Vetterlein* 124 U.S. at 172, 8 S.Ct. at 443.

Following the rather twisted and uncertain path described above, it is possible to conclude that Kennedy obtained a lien on

---

**25.** Garnishment permits the judgment creditor to recover only that property that the judgment debtor could recover from the garnishee defendant in a suit of law. *Crane*, 238 Ill.App. at 268.

the Proceeds on May 10, 1992.[26] This court, however, has some concern about beneficiaries as required parties. It is entirely possible, that the other federal courts which would have reviewed this matter, would have had the same concern. Moreover, if the lien did not attach until July, 1992, when the Miller children voluntarily appeared, then the lien would have clearly been avoidable under § 547 of the Bankruptcy Code. Even if this case were to have followed the last scenario posed, Kennedy still had one more arrow in his quiver—the Sequestrator.

Following entry of the judgment in accordance with the mandate of the Illinois Appellate Court, one of the first things Kennedy did was to file an emergency motion which resulted in the appointment of the Sequestrator. A sequestrator is appointed to manage or sell assets held by a judgment debtor. *In re Marriage of Pick,* 167 Ill.App.3d 294, 118 Ill.Dec. 53, 56, 521 N.E.2d 121, 124 (2nd Dist.1988).

Use of sequestration under the Code of Civil Procedure has been questioned. *See, Marriage of Pick,* 118 Ill.Dec. at 57, 521 N.E.2d at 125, ("with the enactment of section 2–1402, the use of sequestration as an enforcement remedy seems for the most part to have been abolished"). Accordingly, Kennedy's reliance on *Rochford v. Laser,* 91 Ill.App.3d 769, 46 Ill.Dec. 943, 953, 414 N.E.2d 1096, 1106 (1st Dist.1980) for a court's authority to appoint a sequestrator is misplaced.

The court in *Marriage of Pick,* 118 Ill. Dec. 53, 521 N.E.2d 121, did, however, recognize appointment of a receiver as a viable enforcement remedy under the Code of Civil Procedure. Ill.Rev.Stat. ch. 110, par. 2–415; *Id.* 118 Ill.Dec. at 56, 521 N.E.2d at 124. The key difference between the two remedies is the sequestrator's authority to sell property. *Id.* Furthermore, the court noted that the label placed on the person is not dispositive, but, rather it is the duties actually assigned to him.

Although the Sequestrator oversaw the sale of the Fox River Farm, it was not a forced sale and accordingly the Sequestrator may have been more accurately labelled a receiver. At least one bankruptcy court has recognized the superiority of a creditor claiming under a state court appointed receiver, to a trustee as a *bona fide purchaser* under § 544(a)(3). *In re Ebel,* 144 B.R. 510 (D.Colo.1992).

In *Ebel,* the debtor's former wife filed a complaint to force the trustee to abandon a ½ interest in a golf course previously owned by the debtor and his wife, as tenants in common. The golf course had been under the control of a state court appointed receiver since July of 1987, pursuant to an order entered during the divorce proceedings. In June of 1990, shortly after the debtor had filed a petition under Chapter 7, the bankruptcy court granted relief from the stay to allow the state court to divide the marital property. The state court awarded the golf course to the wife. The wife claimed that the golf course was not property of the estate and sought a turnover order.

The district court determined that the trustee was on constructive notice of the wife's inchoate interest in the golf course through the receiver having possession of the golf course, at the time the debtor filed bankruptcy. Because of this notice, the court found that a sale by the debtor, to the trustee as a bona fide purchaser after the filing of the bankruptcy, would not have passed good title. Accordingly, the court concluded that the trustee could not avoid the wife's interest under § 544(a)(3). *Ebel,* 144 B.R. at 516.

Would the same rule apply to a trustee as a judicial lien creditor under § 544(a)(1) of the Bankruptcy Code? Like the other issues raised by these proceedings, it is not necessary for this court to answer that question.

**26.** May 10, 1992, would put the transfer beyond the 90 day reach back period of § 547 of the Bankruptcy Code. However, the Trustee had raised the argument that Kennedy was an "insider", as that term is defined by § 101(31) of the Bankruptcy Code, thereby extending the reach back period to one year preceding the filing of the bankruptcy petition. 11 U.S.C. § 547(b)(4)(B).

The purpose of this involved discussion is to demonstrate why the Settlement Agreement is in the best interests of the estate, rather than deciding the issues raised by Kennedy's motion and by the Trustee in his response and in the Complaint. Given the steps taken by Kennedy to cover all bases, it is not unlikely that he would have succeeded at one or more stages of this litigation. What the final outcome would have been, is up in the air. When approving a settlement this court is not "required to establish the outcome of the litigation to a legal certainty." *Central Ice Cream,* 59 B.R. at 487.

It is apparent to this court that whatever it's decision on Kennedy's motion, that the losing party would have appealed. Although approximately $500,000 is not, in today's terms, an immense amount of money, it was surely enough to give both sides the impetus to take this case to the Court of Appeals. The fund potentially available to creditors of these two estates would have been substantially depleted by the costs of litigation. While this case may have provided an avenue for the Seventh Circuit to decide several areas of law riddled with confusion, such a course is not, in the considered opinion of this court, in the best interests of the estates or of their creditors.

Accordingly the court finds and determines that the settlement is in the best interests of both of the estates and their creditors and therefore approves the Settlement Agreement. By this Settlement Agreement, both estates benefit, the creditors benefit and Kennedy benefits.[27]

---

27. At the outset of this Opinion, this Court commented on the unreasonable length of the litigation between the Millers and Kennedy. The Millers apparently filed bankruptcy in an attempt to thwart Kennedy's efforts to finally bring that litigation to an end and satisfy his judgment. It is perhaps a bitter irony to the Millers, that upon filing bankruptcy, the matter was taken out of their hands, and put into those of a court appointed trustee.